United States District Court
Southern District of Texas
**ENTERED**
December 30, 2021
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ARYA RISK MANAGEMENT SYSTEMS, PVT. LTD., and WINCAB RISK SOLUTION, LLC, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. H-16-3595 |
| DUFOSSAT CAPITAL PUERTO RICO, LLC, DUFOSSAT CAPITAL, LP, DUFOSSAT CAPITAL I, LLC, DUFOSSAT CAPITAL GP, LLC, and ASHTON SONIAT, | § § § § § § | |
| Defendants. | § | |

**MEMORANDUM OPINION AND ORDER**

Pending before the court are Plaintiffs' and Counter-Defendants' Motion for Summary Judgment on Defendants' Counterclaims and Brief in Support ("Plaintiffs' MSJ") (Docket Entry No. 351), The Dufossat Defendants' Response to Plaintiffs' and Counter-Defendants' Motion for Summary Judgment on Defendants' Counterclaims and Brief in Support ("Defendants' Response") (Docket Entry No. 353), in which "the Dufossat Defendants ask the Court to permit them to file a parallel motion for summary judgment related to Arya's claims related to the services provided by Arya to the Dufossat Defendants," and "also ask that they be granted leave to file a motion for summary judgment related to Manoj [Ghayalod]'s stipulation at the Pre-trial Hearing that he was fired for cause as that term is defined in the Operating Agreement,"[1] and the Dufossat

---

[1]Defendants' Response, Docket Entry No. 353, p. 9.  Page
(continued...)

1

Defendants' Motion to Strike and in the Alternative, Their Surreply
to Plaintiffs'/Counter-Defendants' Response Seeking to Support
Motion for Summary Judgment ("Defendants' Motion to Strike and
Surreply") (Docket Entry No. 364). Also pending before the court
are the Appendix of Exhibits to Plaintiffs' and Counter-Defendants'
Motion for Summary Judgment on Dufossat's Counterclaims and Brief
in Support ("Plaintiffs' Exhibits") (Docket Entry No. 352), the
Appendix of Exhibits to the Dufossat Defendants' Response to
Plaintiffs' and Counter-Defendants' Motion for Summary Judgment on
Defendants' Counterclaims and Brief in Support ("Defendants'
Exhibits")(Docket Entry No. 354), Plaintiffs' and Counter-
Defendants' Reply in Support of Their Motion for Summary Judgment
on Defendants' Counterclaims ("Plaintiffs' Reply")(Docket Entry
No. 355), Appendix of Exhibits to Plaintiffs' and Counter-
Defendants' Reply in Support of Their Motion for Summary Judgment
on Dufossat's Counterclaims ("Plaintiffs' Reply Exhibits") (Docket
Entry No. 356), Plaintiffs' and Counter-Defendants' Response to
Defendants' Sur-Reply in Opposition to Plaintiffs' Motion for
Summary Judgment on Defendants' Counterclaims ("Plaintiffs'
Response to Defendants' Surreply") (Docket Entry No. 365), and
briefs which the parties have submitted in response to the court's
Order for Additional Briefing (Docket Entry No. 369): Plaintiffs'

---

[1](...continued)
numbers for docket entries in the record refer to the pagination
inserted at the top of the page by the court's electronic filing
system, CM/ECF.

2

and Counter-Defendants' Brief Regarding Exercise of Supplemental
Jurisdiction (Docket Entry No. 370), and Defendants' Memorandum of
Law (Docket Entry No. 371).

For the reasons stated below, Plaintiffs' MSJ will be granted
in part and denied in part, Defendants' requests to file motions
for summary judgment will be denied, Defendants' Motion to Strike
will be denied, and the court will continue to exercise
supplemental jurisdiction over the remaining state law claims.

## I. **Factual and Procedural Background**

**A.    Factual Background[2]**

In 2009 Defendant Ashton Soniat ("Soniat") formed an energy
and commodities trading company with Mark Schwausch ("Schwausch")
named West Oaks Energy, L.P., ("West Oaks").[3]  Employees of West
Oaks developed a computer program named "Victor," used between 2009
and 2012 to analyze market data and submit energy trades.[4]

---

[2]The facts set forth in this section are derived from the
factual background statements contained in Plaintiffs' MSJ,
Docket Entry No. 351, pp. 8-10; Defendants' Response, Docket
Entry No. 353, pp. 9-11; and the live pleadings: Plaintiffs'
Second Amended Complaint, Docket Entry No. 26; Dufossat Capital
Puerto Rico, LLC's First Amended Counterclaim ("Dufossat's First
Amended Counterclaim"), Docket Entry No. 28; Dufossat Capital
Puerto Rico, LLC's Original Petition Against Pallavi Ghayalod
filed in the 284th Judicial District Court of Montgomery County,
Texas, Cause Number 16-03-03657 ("Dufossat's Original Petition"),
Exhibit F to Counter-Defendant's Notice of Removal filed in Civil
Action 17-3553, Docket Entry No. 1-8.

[3]Dufossat's First Amended Counterclaim, Docket Entry No. 28,
p. 2 ¶ 8.

[4]Id. at 4-5 ¶ 17.

3

In January of 2011 West Oaks hired Manoj Ghayalod ("Manoj") as Managing Director of Quantitative Research and Analytics. Initially, Manoj's primary duty was to manage West Oaks' programming department, but he later began serving as the company's "de-facto Chief Risk Officer."[5]   Soon after he was hired Manoj suggested hiring computer programmers in India as a cost-effective method to optimize West Oaks' computer software.   In order to facilitate this suggestion, Manoj recommended that his wife, Pallavi Ghayalod ("Pallavi"), be hired to identify and recruit computer programmers in India.[6]  With West Oaks' agreement, Pallavi established Plaintiff Arya Risk Management Systems, Pvt. Ltd., ("Arya") in August 2011 to recruit computer programmers.[7]   Manoj and/or Soniat "routinely reviewed the Indian Programmers' resumes and work histories before any hires took place,"[8] and Manoj "took the lead training the Indian Programmers."[9]

West Oaks later became Cobalt Capital Management Partners, L.P., but continued to employ the programmers from India through Plaintiff Arya, who paid the programmers' salaries and provided them tools and training necessary for their work.   The programmers

---

[5] Id. at 5 ¶ 18.

[6] Id. at 5-6 ¶ 21.

[7] Id. at 6 ¶ 23.

[8] Id. ¶ 25.

[9] Id. at 7 ¶ 27.

rewrote the Victor program and developed a new trading program, called "Trading Program" or "Trader App," which was released for use in mid-2012.[10]

In October of 2013 Soniat and Schwausch agreed to cease doing business as West Oaks and/or Cobalt, part ways, and form their own energy trading companies.[11]   Pursuant to a settlement agreement entered by Soniat and Schwausch, Manoj was to help Schwausch obtain a copy of the West Oaks/Cobalt computer software and data for his new company, Inertia Power LP ("Inertia").[12]   Soniat formed Defendant Dufossat Capital Puerto Rico, LLC, ("Dufossat"), in which Manoj received a one percent membership interest.   Pallavi signed a spousal assent.[13]   About this time Arya assumed administrative control over Dufossat's e-mail system without Soniat's knowledge.[14]

In February of 2014 Arya registered the Trading Program with the United States Copyright Office by identifying itself as the author.   Arya never informed Soniat of the copyright registration.[15]

In June of 2014 Arya offered to provide Dufossat with quantitative trading analysts ("Quants") who were trained to use

---

[10]Id. at 3 ¶ 11 and 6-8 ¶¶ 24-29.

[11]Id. at 8 ¶ 31.

[12]Id. at 8-10 ¶¶ 32-35.

[13]Id. at 9-10 ¶ 35.

[14]Id. at 10-11 ¶ 38.

[15]Id. at 11 ¶ 41.

the Trading Program and to recommend trades based on the program's analysis of market information.  The parties entered an agreement whereby the Arya Quants provided trade recommendations in exchange for Dufossat's payment of thirty percent of all profits made on those trades.  Defendants recorded these trades separately from other accounts, but, without Arya's knowledge, Defendants duplicated the trades in larger quantities on an account in Soniat's name.  Defendants did not pay Arya thirty percent of the profits from these "shadow trades" made in Soniat's name.[16]

In December of 2015 Dufossat proposed a written agreement "to memorialize its business relationship with Arya" that described the development of the Trading Program as a work made for hire.[17]  Arya refused to sign the agreement and, instead, proposed a services agreement that identified the Trading Program as belonging to Arya. The parties were unable to reach an agreement.[18]

By late January of 2016 Defendants allege that they determined that Manoj was not performing his duties as an employee, a minority owner, or a risk officer and, thereby, had cost Dufossat millions of dollars.[19]  Dufossat claims to have halted the services of the

---

[16]Plaintiffs' Second Amended Complaint, Docket Entry No. 26, pp. 5-6 ¶¶ 18-24.

[17]Id. at 4 ¶ 16.  See also Dufossat's First Amended Counterclaim, Docket Entry No. 28, p. 13 ¶ 42.

[18]Plaintiffs' Second Amended Complaint, Docket Entry No. 26, p. 4 ¶ 17.

[19]Dufossat's First Amended Counterclaim, Docket Entry
(continued...)

Quants at that time.   In early February of 2016 Soniat, without warning to Arya, prevented the programmers' access to Dufossat's computer software and data.[20]   Shortly thereafter, Manoj and Pallavi removed laptop and desktop computers from Dufossat's offices. Dufossat responded by changing the office locks.   Manoj and Pallavi then locked Dufossat out of its email system.[21]

On February 10, 2016, seeking to regain control of its email system, Dufossat filed an application for a temporary restraining order against Manoj in state district court in Montgomery County.[22]

On February 24, 2016, Dufossat terminated Manoj's employment, but Manoj remained a minority interest owner of the company.[23]

After Manoj's termination and discontinuance of the its relationship with Arya, Defendants continued using the Trading Program and hired former Arya Quants to provide the services they had been providing through Arya.[24]

Later in 2016 Arya formed companies with the primary purpose of marketing the Trading Program on the internet.[25]

---

[19](...continued)
No. 28, p. 12 ¶ 43.

[20]Id. ¶ 44.

[21]Id. at 13-14 ¶ 45.

[22]Id.

[23]Id. & n. 4.

[24]Plaintiffs' Second Amended Complaint, Docket Entry No. 26, p. 7 ¶ 26.

[25]Dufossat's First Amended Counterclaim, Docket Entry No. 28, pp. 13-14 ¶¶ 46-49.

**B.   Procedural Background**

This case is a combination of three actions described in the August 22, 2019, Memorandum and Recommendation (Docket Entry No. 237), in which Magistrate Judge Johnson recommended the imposition of sanctions on Plaintiffs for spoliation of evidence.[26] Plaintiffs's live complaint asserts 18 causes of action against all defendants unless otherwise stated for (1) copyright infringement, (2) contributory copyright infringement, (3) misappropriation of trade secrets through continued use of the Trading Program, (4) theft of trade secrets through continued use of the Trading Program, (5) misappropriation of trade secrets through hiring of Arya Quants, (6) theft of trade secrets through hiring of Arya Quants, (7) tortious interference with contract, (8) knowing participation in breach of fiduciary duty through hiring of Arya Quants, (9) breach of contract for IT services against Dufossat, (10) breach of contract for Quant services against Dufossat, (11) promissory estoppel against Dufossat, (12) quantum meruit, (13) unjust enrichment, (14) misappropriation of trade secrets through shadow trades, (15) theft of trade secrets through shadow trades, (16) fraud, (17) negligent misrepresentation, and (18) tortious interference with Dufossat-Arya Contract against Soniat.[27].

---

[26]See also Defendants' Memorandum of Law, Docket Entry No. 371, pp. 5-7 (describing the parties' multiple actions).

[27]Plaintiffs' Second Amended Complaint, Docket Entry No. 26,
(continued...)

The counterclaims for which Plaintiffs seek summary judgment are asserted in two live pleadings: (1) Dufossat's First Amended Counterclaim, which asserts claims against Arya and Wincab Risk Solution, LLC ("Wincab"), Arya's United States agent, for Declaratory Judgment, misappropriation of trade secrets, knowing participation in breach of fiduciary duty, and conversion, and seeks actual damages, unjust enrichment, and reasonable royalty;[28] and (2) Dufossat's Original Petition filed in the 284th Judicial District Court in Montgomery County, Texas, Cause Number 16-03-03657, which asserts claims against Manoj and Pallavi for violations of the Texas Uniform Trade Secrets Act ("TUTSA") and the Texas Theft Liability Act ("TTLA"), conversion, breach of fiduciary duty, breach of contract, constructive fraud, aiding and abetting, assisting and participating, conspiracy, joint enterprise, and spousal (agency) liability, and seeks actual, compensatory, and exemplary damages.[29]

In pertinent part, Magistrate Judge Johnson found that physical damage that Plaintiffs caused to four laptop computers and

---

[27](...continued) pp. 8-24 ¶¶ 28-92.

[28]Dufossat's First Amended Counterclaim, Docket Entry No. 28, pp. 14-18 ¶¶ 50-68.

[29]Dufossat's Original Petition, Exhibit F to Counter-Defendant's Notice of Removal filed in Civil Action 17-3553, Docket Entry No. 1-8, pp. 16-29 ¶¶ 45-94.  On November 29, 2017, this removed action was consolidated into this action.  See Order Granting Counter-Defendant's Unopposed Motion to Consolidate, Docket Entry No. 77.

to an EMC Storage Unit ("EMC Unit"), intentionally and irreparably interfered with Defendants' ability to prove their affirmative claims.[30]  Magistrate Judge Johnson found that physical damage to the EMC Unit was intentionally caused by Pallavi for the purpose of depriving Defendants of information when she had it shipped from India to Texas via New York using the cheapest method possible,[31] and that as a result, Defendants' ability to prove claims that Plaintiffs misappropriated their trade secrets was virtually impossible.[32]  Magistrate Judge Johnson found that physical damage to four laptops was intentionally caused by Manoj for the purpose of depriving Defendants of information when he reformatted computers in his possession to prevent Dufossat from monitoring his communications with his attorney,[33] and that despite not having used any of the four computers after the reformatting, Manoj had only one examined and recovered.[34]  Magistrate Judge Johnson also found that throughout this litigation both Pallavi and Manoj have intentionally acted in bad faith,[35] but she was not persuaded that any emails were permanently lost or that missing emails

---

[30]Memorandum and Recommendation, Docket Entry No. 237, pp. 5-14.

[31]Id. at 14-16.

[32]Id. at 16.

[33]Id. at 16-17.

[34]Id. at 17.

[35]Id. at 17-19, and 20.

significantly hindered Defendants' prosecution of their counterclaims,[36] and that "[t]he dispute of fact regarding the extent of missing information in the e-mail system will be left to the jury."[37] Concluding that "the spoliation of evidence has severely prejudiced Defendants,"[38] Magistrate Judge Johnson explained that

> the data contained on the EMC unit would clearly show if data had been extracted from a device that was solely meant to be a backup unit, thus answering a majority of questions that have been presented. Clear evidence of when and how much data was extracted by Arya Plaintiffs is crucial for Defendants' defenses and claims. The reformatting of computers similarly prevented the Defendants from knowing the extent to which they have claims and defenses. Plaintiffs have repeatedly claimed to have experts that can extract the missing data, but they have not done so.[39]

Asserting that "[t]his is an egregious case. Plaintiffs have willfully and intentionally attempted to manipulate the judicial system and the court's numerous hearings on discovery have been met with delay tactics and deceit,"[40] Magistrate Judge Johnson imposed sanctions, stating that

> [t]he following claims of Arya Plaintiffs against Defendants should be struck: (1) copyright infringement; (2) contributory copyright infringement; (3) misappropriation of trade secrets through continued use of trading program; and (4) theft of trade secrets through continued use of trading program. An adverse

---

[36]Id. at 19-20.

[37]Id. at 20.

[38]Id. at 21.

[39]Id.

[40]Id. at 21-22.

instruction against Arya Plaintiffs is in order for the following of its claims against Dufossat Defendants: (1) misappropriation of trade secretes through hiring of Arya Quants; (2) theft of trade secrets through hiring of Arya Quants; (3) misappropriation of trade secrets through shadow trades; (4) theft of trade secrets through shadow trades. Arya Plaintiffs' remaining claims against Defendants are not subject to spoliation sanctions: (1) tortious interference with Arya Quant employment and non-disclosure agreements; (2) breach of fiduciary duty during hiring of Arya Quants; (3) quantum meruit related to services provided.   Also remaining unsanctioned are Arya Plaintiffs' claims against only Dufossat: (1) breach of contract for failing to pay for IT services; (2) breach of contract for failing to pay the trade percentage owed; and (3) promissory estoppel related to the trade percentage.

Entries of default are warranted on the following affirmative claims of Dufossat against Manoj and Pallavi: (1) misappropriation of trade secrets related to the Trader App; (2) conversion of the Trader App; and (3) theft of laptops, files, and information. Adverse inference instructions against Manoj and Pallavi are warranted on the remainder of Dufossat's claims against them: (1) breach of fiduciary duty; (2) breaches of spousal assent and operating agreement; (3) constructive fraud; (4) aiding and abetting; (5) assisting and participating; (6) conspiracy; (7) joint enterprise; (8) spousal liability.

Entries of default are also warranted on the following affirmative claims of Dufossat against Arya Plaintiffs: (1) misappropriation of trade secrets related to the Trader App; (2) conversion of the Trader App; (3) conspiracy; and (4) declaration of ownership of the Trader App copyright.   The remaining claim of Dufossat against Arya Plaintiffs, breach of fiduciary duty, is not subject to sanctions.

Defendants and Soniat are not impeded by the spoliation of evidence in mounting their defenses of all claims asserted against them by Manoj.   Accordingly, no sanctions are warranted.[41]

---

[41] Id. at 22-23.

On September 26, 2019, the court entered an Order Adopting Magistrate Judge Johnson's Memorandum and Recommendation ("Spoilation Order") (Docket Entry No. 247).

At Docket Call on July 9, 2021, the court allowed Plaintiffs to "file a motion for summary judgment not to exceed 25 pages on any dispositive issues and principally damages,"[42] including TUTSA preemption,[43] and breach of contract based on the spousal consent agreement signed by Pallavi.[44]

## II. **Defendants' Requests to File Motions for Summary Judgment**

Acknowledging that at Docket Call held on July 9, 2021, Plaintiffs sought and received the court's permission to file a motion for summary judgment on the issue of damages, Defendants argue that "Plaintiffs now assert two additional grounds for their motion."[45]  Contrary to Defendants' argument, the court allowed Plaintiffs to "file a motion for summary judgment . . . on any dispositive issues and principally damages,"[46] including TUTSA preemption,[47] and breach of contract based on the spousal consent

---

[42]Docket Call Transcript, Docket Entry No. 367, p. 20:15-17.

[43]Id. at 21:13-17.

[44]Id. at 39:10-11.

[45]Defendants' Response, Docket Entry No. 353, p. 8.

[46]Docket Call Transcript, Docket Entry No. 367, p. 20:15-17.

[47]Id. at 21:13-17.

agreement signed by Pallavi.[48]  In response to Plaintiffs' MSJ

> Defendants ask the Court to permit them to file a
> parallel motion for summary judgment related to Arya's
> claims related to the services provided by Arya to the
> Dufossat Defendants.  The Dufossat Defendants also ask
> that they be granted leave to file a motion for summary
> judgment related to Manoj's stipulation at the Pre-trial
> Hearing that he was fired for cause as that term is
> defined in the Operating Agreement.[49]

Because Defendants have not cited any reasons why they did not or

could not have asked to file "a parallel motion for summary

judgment" during Docket Call, because Defendants have neither

submitted the motion for summary judgment that they seek to file

nor identified the arguments that they would be raised therein, and

because granting Defendants' request would delay the resolution of

this action, which is over five years old, Defendants' request to

file "a parallel motion for summary judgment" will be denied.


### III. Defendants' Motion to Strike

Quoting Jones v. Cain, 600 F.3d 527, 541 (5th Cir.2010), for

the principle that "arguments raised for the first time in a reply

brief are generally waived,"[50] Defendants move the court "to strike

Plaintiffs' Reply Brief to the extent i[t] contains new arguments

and evidence not briefed in its Motion for Summary Judgment."[51]

---

[48]Id. at 39:10-11.

[49]Defendants' Response, Docket Entry No. 353, p. 9.

[50]Defendants' Motion to Strike and Surreply, Docket Entry No. 364, p. 6.

[51]Id.

Defendants assert that Plaintiffs have raised the following new arguments not addressed in their original no evidence Motion for Summary Judgment: 1) objections to any evidence raised for the first time in the Reply, given Plaintiffs' previously stated position and representation to the Court that there was "no evidence" of damages; 2) irrelevant issues raised by Plaintiffs for the first time in the Reply; 3) arguing for an extension of TUTSA in bad faith, for the first time in the Reply; 4) trying to overcome the adverse inferences from the sanctions order adopted by this Court, for the first time in the Reply.[52]

In pertinent part Defendants argue that

> Plaintiffs have known about the evidence of damages because it was produced to them, and instead of addressing that evidence in their Motion for Summary Judgment to buttress their arguments of no evidence, they simply ignored it — hoping to sweep it under the rug so the Court would not notice. Plaintiffs know the extent of TUTSA, both in the Texas state courts and the Fifth Circuit and have been long aware of both Defendants' claims and the Court's sanctions orders, but again hoped that no one would shine a light on the fact that TUTSA is not a panacea to all common law tort claims — it is clear that TUTSA does not apply when the underlying tort is not related to theft of trade secret or when there is a contract in play. Plaintiffs have known about the adverse inference and the fact that they needed to address it, despite their every attempt, so far, to get out from under the sanctions have been blunted and stymied — it is part of their burden as the movant to address it, and they did not.[53]

Plaintiffs respond that they "are entitled to summary judgment on Defendants' counterclaims because Defendants still have no evidence of damages,"[54] and because Defendants' tort counterclaims are preempted by TUTSA.[55]

---

[52]Id. at 7.

[53]Id. at 7-8.

[54]Plaintiffs' Response to Defendants' Surreply, Docket Entry No. 365, p. 3.

[55]Id. at 10.

Contrary to Defendants' arguments, Plaintiffs did not raise the issues about which Defendants complain for the first time in their reply brief. Plaintiffs argued in their MSJ that Defendants are not able to cite evidence capable of establishing damages,[56] and that Defendants' tort claims are preempted by TUTSA.[57] Plaintiffs also pointed out that "[a] spoliation instruction does not take the place of actual evidence of damages."[58]  Accordingly, Defendants' Motion to Strike will be denied.

## IV. **Plaintiffs' Motion for Summary Judgment**

Plaintiffs argue that they are entitled to summary judgment on Defendants' counterclaims because they are all preempted by the TUTSA, because Defendants have not presented any evidence of damages, and because Pallavi cannot be held liable for either breach of the operating agreement or breach of fiduciary duty. Defendants respond that their claims for breach of contract and breach of fiduciary duty are not preempted by TUTSA, that they have presented sufficient evidence of damages to preclude summary judgment, and that Pallavi can be held liable both for breach of contract and breach of fiduciary duty.

---

[56]Plaintiffs' MSJ, Docket Entry No. 351, pp. 12-26.

[57]Id. at 26-29.

[58]Id. at 17 n. 1.

16

## A.    Standard of Review

Summary judgment is authorized if the movant establishes that there is no genuine dispute about any material fact, and the law entitles it to judgment. Fed. R. Civ. P. 56. Factual disputes are "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2511 (1986). The Supreme Court has interpreted the plain language of Rule 56 to mandate the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2552 (1986). A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (quoting Celotex, 106 S. Ct. at 2553-2554). If the moving party meets this burden, the nonmovant must go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, or other admissible evidence that facts exist over which there is a genuine issue for trial. Id. "[T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson

Plumbing Products, Inc., 120 S. Ct. 2097, 2110 (2000).   Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." Little, 37 F.3d at 1075.


**B.    Analysis**

1.   The Texas Uniform Trade Secrets Act ("TUTSA")

Plaintiffs argue that they are entitled to summary judgment on Dufossat's tort claims because they are all preempted by TUTSA.[59] Defendants argue that TUTSA does not preempt Dufossat's breach of contract and breach of fiduciary duty claims.[60]   Citing 360 Mortgage Group, LLC v. HomeBridge Financial Services, Inc., No. A-14-CA-00847-SS, 2016 WL 900577, at *7-*8 (W.D. Tex. March 2, 2016), Defendants argue that

> [i]n 360 Mortgage Group, the court found that claims for conversion, unjust enrichment, and a constructive trust were preempted by TUTSA on the ground that they were based on the same underlying harm — taking confidential information. . . Importantly, however, the 360 Mortgage court found that a breach of fiduciary duty claim was not preempted by TUTSA because there were "facts unrelated to Plaintiffs' misappropriation claim which could support Plaintiffs' breach of fiduciary [duty] claim." Id. at *7.   The court pointed to other evidence unrelated to the taking of confidential information to support a claim for breach of fiduciary duty, including continuing to work

---

[59]Plaintiffs' MSJ, Docket Entry No. 351, pp. 26-29; Plaintiffs' Reply, Docket Entry No. 355, pp. 25-29.

[60]Defendants' Response, Docket Entry No. 353, pp. 26-29.

for an employer for a month after violating an agreement, deletion of potentially incriminating emails, and submission of a false declaration to the court stating that the employee delivered a formal resignation letter. Id. The court concluded that "[b]ecause the claim is based on facts unrelated to those which form the basis of the trade secret misappropriation claims, Plaintiffs' breach of fiduciary duty claim i[s] not preempted.[61]

(a)   Applicable Law

The Texas Uniform Trade Secrets Act ("TUTSA"), which became effective in 2013, governs claims for trade secret misappropriation in Texas.   Tex. Civ. Prac. & Rem. Code §§ 134A.001 et seq.   TUTSA defines "misappropriation" as:

(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) disclosure or use of a trade secret of another without express or implied consent by a person who:

(i) used improper means to acquire knowledge of the trade secret;

(ii) at the time of disclosure or use, knew or had reason to know that the person's knowledge of the trade secret was:

(a) derived from or through a person who used improper means to acquire the trade secret;

(b) acquired under circumstances giving rise to a duty to maintain the secrecy of or limit the use of the trade secret; or

(c) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of or limit the use of the trade secret. . .;

_____

[61]Id. at 27.

19

> (iii) before a material change of the position of the person, knew or had reason to know that the trade secret was a trade secret and that knowledge of the trade secret had been acquired by accident or mistake.

Tex. Civ. Prac. & Rem. Code §§ 134A.002(3).

TUTSA defines trade secrets as any type of information that the owner has taken reasonable measures to keep secret and which derives economic value, potential or actual, from not being generally known to others who can obtain economic value from the disclosure or use.  Tex. Civ. Prac. & Rem. Code §§ 134A.002(6).

TUTSA's preemption provision states that

> (a) Except as provided by Subsection (b), this chapter displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret.

> (b) This chapter does not affect:

>> (1) contractual remedies, whether or not based upon misappropriation of a trade secret;

>> (2) other civil remedies that are not based upon misappropriation of a trade secret; or

>> (3) criminal remedies, whether or not based upon misappropriation of a trade secret.

Tex. Civ. Prac. & Rem. Code § 134A.007.  Because TUTSA's exemption provision does not apply to "contractual remedies, whether or not based upon misappropriation of a trade secret," Defendants' counterclaims for breach of contract are not preempted. Defendants' other state law claims are preempted unless they "are not based upon misappropriation of a trade secret."  Id. at

20

§ 134A.007(b)(2). <u>See also</u> <u>360 Mortgage Group</u>, 2016 WL 900577, at

*7 (finding that claims for conversion, unjust enrichment, and

constructive trust were preempted by TUTSA because they were based

on the same underlying harm — taking confidential information, but

that a breach of fiduciary duty claim was not preempted by TUTSA

because there were "facts unrelated to Plaintiffs' misappropriation

claim which could support Plaintiffs' breach of fiduciary claim").

 

(b)   Application of the Law to the Facts

### (1)  Counterclaims Against Arya and Wincab

The only relevant counterclaim that Dufossat has asserted

against Arya and Wincab is for knowing participation in breach of

fiduciary duty.[62]  In support of this counterclaim Dufossat alleges

that "Arya, by and through Pallavi, knew that Manoj owed fiduciary

duties to Dufossat, and Arya was aware it was participating in the

breach of those fiduciary duties by, among other things,

misappropriating Dufossat's Company Software and Company Data."[63]

Because the facts that Dufossat alleges in support of the

counterclaim for knowing participation in breach of fiduciary duty

---

[62]Dufossat's First Amended Counterclaim, Docket Entry
No. 28, pp. 16 ¶¶ 60-62.  <u>See also</u> Memorandum and Recommendation,
Docket Entry No. 237, p. 23 (explaining that entries of default
are warranted on Dufossat's other state common law claims against
Manoj and Pallavi).  <u>See also</u> Duffosat's First Amended
Counterclaim, Docket Entry No. 28, pp. 15-18.

[63]Dufossat's First Amended Counterclaim, Docket Entry
No. 28, p. 16 ¶ 61.

asserted against Arya and Wincab are based upon "misappropriating
Dufossat's Company Software and Company Data," this counterclaim is
preempted by the TUTSA.  See Super Starr International, LLC v.
Fresh Tex Produce, L.L.C., 531 S.W.3d 829, 843 (Tex. App. – Corpus
Christi-Edinburg 2017, no pet. h.) ("Where a claim is based on a
misappropriation of a trade secret, then it is preempted by the
[TUTSA]."); 360 Mortgage Group, 2016 WL 900577, at *7 (finding
breach of fiduciary duty claim not preempted "[b]ecause the claim
is based on facts unrelated to those which form the basis of the
trade secret misappropriation claim"); ScaleFactor, Inc. v. Process
Pro Consulting, LLC, 394 F.Supp.3d 680, 685 (W.D. Tex. 2019) ("a
tort claim is preempted by TUTSA if it is 'based on the
unauthorized use of information' – trade secret or not").

### (2)  Counterclaims Against Manoj and Pallavi

Dufossat has asserted counterclaims against Manoj and Pallavi
for breach of fiduciary duty, constructive fraud, aiding and
abetting, assisting and participating, conspiracy, joint
enterprise, and spousal liability, for which Dufossat seeks actual,
compensatory, and exemplary damages.[64]   In support of the
counterclaim for breach of fiduciary duty asserted against Manoj
and Pallavi, Dufossat alleges that

---

[64]Dufossat's Original Petition, Exhibit F to Counter-
Defendant's Notice of Removal filed in Civil Action 17-3553,
Docket Entry No. 1-8, pp. 19-29 ¶¶ 56-60, 65-68, 74-94.

> Manoj neglected his duties related to the Follow Book which resulted in losses to Dufossat in the millions of dollars. In addition, Manoj failed to protect Dufossat's confidential information, including the Trader App software and/or he aided, assisted and/or conspired with his wife, Pallavi, to allow Pallavi's company, Arya, to obtain a copy of Dufossat's software and file a copyright application claiming ownership of the Trader App software. Finally, Manoj and Pallavi conspired to misappropriate Dufossat's confidential information to use against Dufossat and so that they could start Trident — a business that directly competed against Dufossat. Manoj even prepared PowerPoint presentations and provided confidential information to Trident while he was still employed by Dufossat.[65]

But for the allegation that "Manoj neglected his duties related to the Follow Book which resulted in losses to Dufossat in the millions of dollars," the facts that Dufossat alleges in support of the counterclaim for breach of fiduciary duty against Manoj and Pallavi are based on misappropriation of trade secrets. Dufossat's claim for breach of fiduciary duty is not preempted to the extent that it is based on allegations that "Manoj neglected his duties related to the Follow Book which resulted in losses to Dufossat in the millions of dollars," see 360 Mortgage Group, 2016 WL 900577, at *7, but is preempted as to factual allegations based on the misappropriation of trade secrets. See Super Starr, 531 S.W.3d at 843, and ScaleFactor, 394 F.Supp.3d at 685.

In support of the counterclaim for constructive fraud asserted against Manoj and Pallavi, Dufossat alleges that

Manoj and Pallavi had a fiduciary relationship with

---

[65]Id. at 19 ¶ 58.

> Dufossat arising out of Manoj's employment, management, and ownership positions and responsibilities with Dufossat and his relationships of trust and confidence with Duffosat. . . . Manoj and Pallavi engaged in conduct that deceived Dufossat, violated its confidences, and caused injury to public interests. Such conduct, included, without limitation, using Dufossat's confidential information and trade secretes to actively compete with and defraud Dufossat, and engaging in blatant self-dealing with his wife, Pallavi, to Dufossat's detriment and the benefit of himself. Both Manoj and Pallavi hid their activities from Dufossat and attempted to cover up their illegal activities when they removed computers from Dufossat's offices and/or removed confidential information from Dufossat's computers.[66]

Because the facts alleged in support of the counterclaim for constructive fraud are based upon Manoj's and Pallavi's use of Dufossat's confidential information, this counterclaim is preempted by TUTSA. See Super Starr, 531 S.W.3d at 843, and ScaleFactor, 394 F.Supp.3d at 685.

In support of the counterclaim for aiding and abetting asserted against Manoj and Pallavi, Dufossat alleges that

> Manoj was both an employee and an owner of Dufossat. Accordingly, he owed a fiduciary duty to act in the best interests of Dufossat. In a supposed attempt to save money, Manoj recommended to Soniat that Dufossat hire India Programmers. In addition, Manoj encouraged Soniat to engage his wife, Pallavi, to recruit the India Programmers. Manoj assured Soniat that he would train and supervise the India Programmers and that he would protect Dufossat's confidential information, including its Trader App software.
>
> As opposed to protecting Dufossat's confidential information, especially the Trader App software, Manoj aided and abetted Pallavi, his wife, in converting and misappropriating Dufossat's confidential information. To

---

[66]Id. at 21 ¶ 66.

> be specific, Manoj actively assisted Pallavi in copying
> Dufossat's Trader App software on a server in India for
> the purpose of misappropriating the software.   In
> addition, Manoj actively assisted his wife in converting
> Dufossat's confidential information, including Dufossat's
> e-mail system.   Finally, Manoj (while still employed by
> Dufossat) actively assisted his wife in obtaining
> Dufossat's confidential information to use in her
> competing business.[67]

Because the facts that Dufossat has alleged in support of the

counterclaim for aiding and abetting are based upon converting,

misappropriating, and using Dufossat's confidential information,

this counterclaim is preempted by TUTSA.   See Super Starr, 531

S.W.3d at 843, and ScaleFactor, 394 F.Supp.3d at 685.

In support of the counterclaim for assisting and participating

asserted against Manoj and Pallavi, Dufossat alleges that

> Manoj was both an employee and an owner of Dufossat.
> Accordingly, he owed a fiduciary duty to act in the best
> interests of Dufossat.   In a supposed attempt to save
> money, Manoj recommended to Soniat that Dufossat hire
> India Programmers.   In addition, Manoj encouraged Soniat
> to engage his wife, Pallavi, to recruit the India
> Programmers.   Manoj assured Soniat that he would train
> and supervise the India Programmers and that he would
> protect Dufossat's confidential information, including
> its Trader App software.
>
> As opposed to protecting Dufossat's confidential
> information, especially the Trader App software, Manoj
> assisted and participated with Pallavi, his wife, in
> converting and misappropriating Dufossat's confidential
> information.   To be specific, Manoj actively assisted
> Pallavi in copying Dufossat's Trader App software on a
> server in India for the purpose of misappropriating the
> software.   In addition, Manoj actively assisted his wife
> in converting Dufossat's confidential information,
> including Dufossat's e-mail system.   Manoj also actively

---

[67]Id. at 23-24 ¶¶ 75-76.

provided confidential information to Trident, a business created by his wife to compete directly against Dufossat.[68]

Because the facts alleged in support of the counterclaim for assisting and participating asserted against Manoj and Pallavi are based upon converting, misappropriating, and using Dufossat's confidential information, this counterclaim is preempted by TUTSA. See Super Starr, 531 S.W.3d at 843, and ScaleFactor, 394 F.Supp.3d at 685.

In support of the counterclaim for conspiracy asserted against Manoj and Pallavi, Dufossat alleges that

Manoj was both an employee and an owner of Dufossat. Accordingly, he owed a fiduciary duty to act in the best interests of Dufossat. In a supposed attempt to save money, Manoj recommended to Soniat that Dufossat hire India Programmers. In addition, Manoj encouraged Soniat to engage his wife, Pallavi, to recruit the India Programmers. Manoj assured Soniat that he would train and supervise the India Programmers and that he would protect Dufossat's confidential information, including its Trader App software.
As opposed to protecting Dufossat's confidential information, especially the Trader App software, Manoj conspired with Pallavi, his wife, in a scheme to convert and misappropriate Dufossat's confidential information. To be specific, Manoj conspired with Pallavi in copying Dufossat's Trader App software on a server in India for the purpose of misappropriating the software. In addition, Manoj conspired with his wife in converting Dufossat's confidential information, including Dufossat's e-mail system.[69]

Because the facts alleged in support of the counterclaim for conspiracy asserted against Manoj and Pallavi are based upon

---

[68]Id. at 24-25 ¶¶ 79-80.

[69]Id. at 25-26 ¶¶ 83-84.

26

converting, misappropriating, and using Dufossat's confidential
information, this counterclaim is preempted by TUTSA.  See Super
Starr, 531 S.W.3d at 843, and ScaleFactor, 394 F.Supp.3d at 685.

In support of the counterclaim for joint enterprise asserted
against Manoj and Pallavi, Dufossat alleges that

> Manoj was both an employee and an owner of Dufossat.
> Accordingly, he owed a fiduciary duty to act in the
> best interests of Dufossat.  In a supposed attempt to save
> money, Manoj recommended to Soniat that Dufossat hire
> India Programmers.  In addition, Manoj encouraged Soniat
> to engage his wife, Pallavi, to recruit the India
> Programmers.  Manoj assured Soniat that he would train
> and supervise the India Programmers and that he would
> protect Dufossat's confidential information, including
> its Trader App software.
>
> As opposed to protecting Dufossat's confidential
> information, especially the Trader App software, Manoj
> entered into a joint enterprise with Pallavi, his wife,
> to convert and misappropriate Dufossat's confidential
> information.  To be specific, Manoj entered into an
> agreement with Pallavi for the purpose of enriching
> themselves at the expense of Dufossat.  The ultimate goal
> of the joint enterprise included the misappropriation of
> Dufossat's confidential information, including Dufossat's
> Trader App software.  In that regard, Manoj (while still
> employed by Dufossat) prepared PowerPoint presentations
> and provided other confidential information to Trident,
> a business started by his wife to compete directly
> against Dufossat.[70]

Because the facts alleged in support of the counterclaim for joint
enterprise asserted against Manoj and Pallavi are based upon
converting and misappropriating Dufossat's confidential
information, this counterclaim is preempted by TUTSA.  See Super
Starr, 531 S.W.3d at 843, and ScaleFactor, 394 F.Supp.3d at 685.

---

[70]Id. at 26-27 ¶¶ 87-88.

In support of the counterclaim for spousal (agency) liability asserted against Manoj and Pallavi, Dufossat alleges that

> Manoj was both an employee and an owner of Dufossat. Accordingly, he owed a fiduciary duty to act in the best interests of Dufossat. In a supposed attempt to save money, Manoj recommended to Soniat that Dufossat hire India Programmers. In addition, Manoj encouraged Soniat to engage his wife, Pallavi, to recruit the India Programmers. Manoj assured Soniat that he would train and supervise the India Programmers and that he would protect Dufossat's confidential information, including its Trader App software.
>     As opposed to protecting Dufossat's confidential information, especially the Trader App software, Manoj had an agency relationship with Pallavi, his wife, to convert and misappropriate Dufossat's confidential information so that the confidential [information] could be used in a competing business enterprise. To be specific, Manoj had an agency relationship with his wife, Pallavi, for the purpose of enriching themselves at the expense of Dufossat. The ultimate goal of the relationship included the misappropriation of Dufossat's confidential information, including Dufossat's Trader App software so that it could be used by Trident, a business enterprise created by Pallavi, or other businesses created by Pallavi.[71]

Because the facts alleged in support of the counterclaim for spousal liability is based upon converting, misappropriating, and using Dufossat's confidential information, this counterclaim is preempted by TUTSA. See Super Starr, 531 S.W.3d at 843, and ScaleFactor, 394 F.Supp.3d at 685.

(c) Conclusions

Because the facts that Dufossat alleges in support of the

---

[71]Id. at 27-28 ¶¶ 92-93.

counterclaim against Arya and Wincab for knowing participation in breach of fiduciary duty are based upon misappropriation of a trade secrets, i.e., misappropriation of Dufossat's company software and data, this claim is preempted by the TUTSA. Because the facts· that Dufossat alleges in support of the counterclaims asserted against Manoj and Pallavi for constructive fraud, aiding and abetting, assisting and participating, conspiracy, joint enterprise, and spousal (agency) liability are based upon converting, misappropriating, and using Dufossat's confidential information, these counterclaims are preempted by the TUTSA. The counterclaims that Defendants assert against Manoj and Pallavi for breach of fiduciary duty are preempted to the extent that they are based upon factual allegations involving conversion, misappropriation and use of Dufossat's confidential information, but are not preempted as alleged against Manoj for neglecting his duties related to the Follow Book, which allegedly resulted in losses to Dufossat.

2. <u>Damages</u>

Asserting that Defendants have failed to present evidence of damages on any of their counterclaims, Plaintiffs argue that they are entitled to summary judgment on all of Defendants'

counterclaims.[72]   Defendants respond that because damages are not
an element of their counterclaim for Declaratory Judgment, the
declaration that Dufossat is the owner of the copyright affiliated
with the Trading Program at issue is unaffected by Plaintiffs'
MSJ;[73] that Dufossat is entitled to adverse inference instructions
that preclude the court from granting Plaintiffs' MSJ;[74] and that
because Defendants have presented evidence of damages sufficient to
raise genuine issues of material fact for trial, Plaintiffs are not
entitled to summary judgment on the issue of damages.[75]

>    (a)   Dufossat's Award of Declaratory Judgment Does Not
>          Preclude the Court from Granting Plaintiffs Partial
>          Summary Judgment on the Issue of Damages

When a party has succeeded on a claim for declaratory
judgment, the court has discretionary authority to award money
damages.  See Noatex Corp. v. King Construction of Houston, LLC,
732 F.3d 479, 487 (5th Cir. 2013); United Teacher Associates
Insurance Co. v. Union Labor Life Insurance Co., 414 F.3d 558, 570-
74 (5th Cir. 2005).  The authority to grant money damages following
a grant of declaratory judgment arises from 28 U.S.C. § 2202, which
states that "[f]urther necessary or proper relief based on a

---

[72]Plaintiffs' MSJ, Docket Entry No. 351, p. 12.

[73]Defendants' Response, Docket Entry No. 353, p. 9.

[74]Id. at 25-26.

[75]Id. at 12-21.

30

declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment." The court's adoption of Magistrate Judge Johnson's Memorandum and Recommendation effectively awards Dufossat declaratory judgment establishing its ownership of the Trader App, but does not establish Dufossat's entitlement to any amount of actual damages, unjust enrichment, or reasonable royalty.[76] Plaintiffs' MSJ asks the court to find that Dufossat has failed to present evidence creating a genuine issue of material fact that Defendants are entitled to recover actual damages, unjust enrichment, or a reasonable royalty. Granting Plaintiffs' MSJ will not deprive Defendants of entitlement to Declaratory Judgment regarding ownership of the disputed software, but will preclude Defendants from recovering damages.

> (b) Plaintiffs' Spoliation of Evidence Does Not Preclude Granting Plaintiffs Partial Summary Judgment on the Issue of Damages

Citing Adobe Land Corp. v. Griffin, LLC, 236 S.W.3d 351 (Tex. App. — Fort Worth 2007, pet. denied), and asserting that they did all they could to get to the bottom of Plaintiffs' scheme,[77]

---

[76]See Dufossat's First Amended Counterclaim, Docket Entry No. 28, pp. 15-16 (declaratory judgment allegations), and 18 (prayer for relief seeking actual damages, unjust enrichment, and a reasonable royalty but not seeking injunctive relief).

[77]Defendants' Response, Docket Entry No. 353, p. 11.

Defendants argue that the court's conclusion that they are entitled
to an adverse inference instruction creates a presumption that
Plaintiffs' spoliation of evidence included spoliation of evidence
of damages, and that adverse inference precludes the court from
granting Plaintiffs summary judgment on the issue of damages.[78]  In
Adobe Land the defendant, a manufacturer of crop-protection
chemicals, discarded its only sample of a batch of one of its
products after the plaintiffs filed suit against the defendant
alleging that the produce was defective and that the product
proximately caused the elimination of the plaintiff's entire
alfalfa crop.  Id. at 358.   The court concluded that summary
judgment for the defendant was not appropriate because the
defendant had destroyed "material evidence that went to the very
heart" of the case.  Id. at 360.

Plaintiffs reply that Defendants' contention that their
inability to establish damages is the result of spoliation ignores
the fact that the spoliation order does not mention damages, and
that Defendants have failed either to argue or to show that the
spoliated computers could reasonably have been expected to provide
evidence of damages.[79]  Asserting that "Defendants never explained
to the magistrate judge or in their Response how the alleged

---

[78]Id. at 25-26.

[79]Plaintiffs' Reply, Docket Entry No. 355, p. 7 (citing
Motion Hearing Transcript, Docket Entry No. 223, p. 75).

spoliation in any way impaired their proof of damage,"[80] Plaintiffs argue that "the only reason the Defendants have no proof of damages is that they suffered no damages."[81]

During the April 29, 2019, sanctions hearing Magistrate Judge Johnson warned the Defendants that even if she agreed to strike Plaintiffs' pleadings, Defendants would still need to prove their damages.[82]  See <u>Paradigm Oil, Inc. v. Retamco Operating, Inc.</u>, 372 S.W.3d 177, 187 (Tex. 2012) (finding death penalty sanction as to damages excessive).  <u>See also</u> <u>U.S. Renal Care, Inc. v. Jaafar</u>, 345 S.W.3d 600, 615 (Tex. App. — San Antonio 2011, pet. denied) ("The adverse inference does not obviate the requirement that Sellers present legally sufficient evidence of their damages.").  Moreover, Defendants have neither argued nor shown that the spoliated evidence would have been relevant to the issue of damages.  And despite asserting that they have done all they could to get to the bottom of Plaintiffs' scheme, Defendants have neither argued nor shown that they could not have obtained evidence of damages from other sources such as the individuals and companies to whom they contend the Plaintiffs sold or licensed the misappropriated

---

[80]<u>Id.</u>

[81]<u>Id.</u> (emphasis omitted).

[82]Motion Hearing Transcript, Docket Entry No. 223, p. 75:19–21 ("whenever a Court strikes pleadings, you still have to prove your damages").

software and data,[83] or the exchanges where they allege Plaintiffs traded using the misappropriated information.[84]  Accordingly, the court is not persuaded that Defendants' entitlement to a spoliation instruction on certain claims precludes granting Plaintiffs' MSJ for failure to present evidence capable of raising genuine issues of material fact for trial on the issue of damages.

> (c)  Defendants Have Not Presented Evidence of Damages Sufficient to Raise Fact Issues for Trial

### (1)  Counterclaims for which Defendants Seek Damages

Defendants seek actual, compensatory, and exemplary damages (1) for the counterclaims for which they have received default judgment against the Arya Plaintiffs, i.e., for misappropriation of trade secrets related to the Trading Program, conversion of the Trading Program, conspiracy, and declaration of ownership of the Trading Program copyright; (2) for the counterclaims for which they have received default judgment against Manoj and Pallavi, for misappropriation of trade secrets related to the Trading Program,

---

[83]See Plaintiffs' Reply, Docket Entry No. 355, pp. 8-9 (citing inter alia pleadings in a federal lawsuit that Dufossat filed in Puerto Rico alleging that several individuals and entities were using the Trader App without authorization or license, that Dufossat dismissed without pursuing discovery; and Defendant Dufossat Capital Puerto Rico, LLC's Objections and Responses to Defendant Pallavi Ghayalod's Fifth Set of Interrogatories, p. 5, Docket Entry No. 330-4, p. 6) (asserting that "Chris Turner, a former trader with Inertia, has purchased a copy of the Trading Software from Arya")).

[84]Id. at 10.

Conversion of the Trading Program, and theft of laptops, files, and information; and (3) for the remaining claims asserted against Manoj and Pallavi, i.e., the claims for which the court has held that adverse inference instructions are warranted: breach of fiduciary duty, breaches of the spousal assent and operating agreement, constructive fraud, aiding and abetting, assisting and participating, conspiracy, joint enterprise, spousal liability. Because for the reasons stated in § IV.B.1(b), above, the court has already concluded that many of Defendants' counterclaims are preempted by TUTSA, the only live counterclaims are those for breach of contract based on the spousal and operating agreements, and for breach of fiduciary duty arising from Manoj's alleged neglect of his duties related to the Follow Book. Damages or proof of injury is an essential element of each of the live counterclaims, and each of the claims for which Defendants have received default judgment except the claim for Declaratory Judgment. See Binh Hoa Le v. Exeter Finance Corp., 990 F.3d 410, 415 (5th Cir. 2021) (quoting Smith International, Inc. v. Egle Group, LLC, 490 F.3d 380, 387 (5th Cir. 2007) (citing damages as an essential element of breach of contract under Texas law)); Belliveau v. Barco, Inc., 987 F.3d 122, 132 & n. 9 (5th Cir. 2021) (quoting Jones v. Blume, 196 S.W.3d 440, 447 (Tex. App.—Dallas 2006, pet. denied) (injury to plaintiff or benefit to defendant is an essential element of breach of fiduciary duty under Texas law)).

Regarding the claims for misappropriation of trade secrets for which Defendants have received default judgment, § 134.A.004(a) of the Texas Civil Practices and Remedies Code states that

> [i]n addition to or in lieu of injunctive relief, a claimant is entitled to recover damages for misappropriation. Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss. In lieu of damages measured by other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret.

Tex. Civ. Prac. & Rem. Code Ann. § 134A.004. Remedies available under the TUTSA thus include injunctive relief, damages measured by actual loss plus unjust enrichment not included in computing actual loss, a reasonable royalty, and exemplary damages capped at two times actual damages. See Southwestern Energy Production Co. v. Berry-Helfand, 491 S.W.3d 699, 710 (Tex. 2016) ("A 'flexible and imaginative' approach is applied to calculation of damages in misappropriation-of-trade-secrets cases."). Because Defendants seek damages but not injunctive relief, they must cite evidence capable of raising a genuine issue of material fact as to damages in order to defeat Plaintiffs' MSJ of their claims for misappropriation of trade secrets. See StoneCoat of Texas, LLC v. ProCal Stone Design, LLC, 426 F. Supp. 3d 311, 347 (E.D. Tex. 2019) (citing Morgan v. Clements Fluids South Texas, Ltd., 589 S.W.3d 177, 191 (Tex. App. — Tyler 2018) (citing Tex. Civ. Prac. & Rem. Code Ann. § 134A.004(a))).

36

**(2)   Defendants' Evidence of Damages**

In support of the argument that they have presented sufficient evidence of damages to avoid summary judgment, Defendants cite (1) marketing materials allegedly prepared by Plaintiffs that reference trading profits; (2) combined balance sheets from Dufossat Capital stating the value of Dufossat's software; (3) Manoj's testimony that he was responsible for a trading loss that exceeded $800,000.00; and (4) a TRO finding that Manoj — assisted by Pallavi — caused irreparable harm to Dufossat Capital's good will, reputation and earnings.[85]

> (A)   The Marketing Materials Dufossat Cites Do Not Provide Evidence of Damages

Citing the declarations of Gregory Forero ("Forero") and Harry Sargeant ("Sargeant"), and marketing materials that Defendants have attached thereto, Defendants argue that they are "due the lost profits about which Manoj and Pallavi boast in the marketing materials."[86]   Forero states in his declaration that on November 3 or 4, 2015, he met with Manoj, who told him that his business relationship with Soniat had ended and that he and his wife, Pallavi, owned the Trading Program.[87]   Forero states that on

---

[85]Defendants' Response, Docket Entry No. 353, p. 26.

[86]Id. at 17.

[87]Declaration of Gregory Forero Under Penalty of Perjury ("Forero Declaration"), ¶¶ 4-5, Exhibit A of Defendants'
(continued...)

37

February 12, 2016, he met with Manoj and Pallavi in Puerto Rico to discuss a possible investment using the Trading Program, and that in February or early March of 2016, he arranged for a meeting at which Pallavi told Sargeant that she owned the Trading Program.[88] Forero also states that on March 23, 2016, Pallavi sent him a presentation, but that because it was the worst investment pitch he had ever read, he let the activity die on the vine.[89]

Sargeant states in his declaration that he met with Forero and Pallavi in the Spring of 2016 so that Pallavi could pitch him on an electricity trading opportunity using proprietary software that Pallavi said she owned. Sargeant states that Pallavi provided an investment track record in the electricity trading sector that she said was from her company's trading, but that because he lacked knowledge of the industry, he chose not to invest.[90]

Included in the exhibit that contains the Forero and Sargeant Declarations are almost thirty pages of text and graphs that Defendants contend evidence transactions as well as profits and

---

[87](...continued)
Exhibits, Docket Entry No. 354-1, pp. 2-3.

[88]Id. at ¶¶ 6-7, Docket Entry No. 354-1, p. 3.

[89]Id. at ¶ 8, Docket Entry No. 354-1, p. 4.

[90]Declaration of Harry Sargeant III Under Penalty of Perjury ("Sargeant Declaration"), Exhibit A of Defendants' Exhibits, Docket Entry No. 354-1, pp. 5-6.

losses that Plaintiffs realized from using the Trading Program.[91]
But these pages are neither mentioned nor incorporated by reference
into either the Forero or the Sargeant declaration, and Defendants
have not cited any evidence from which a reasonable jury could
conclude that these pages are marketing materials that Plaintiffs
created and presented to Forero or Sargeant.   Nor have Defendants
cited any evidence from which a reasonable jury could determine
what, if any, transactions referenced in those pages were made by
Plaintiffs using the Trading Program, or what, if any, profits
Plaintiffs realized or Defendants lost from Plaintiffs' use of the
Trading Program.   In short, Defendants have failed to cite any
evidence explaining how or why the text or graphs contained in the
pages of Defendants' Exhibit A that follow the Forero and Sargeant
declarations evidence Dufossat's damages.

While included amongst these pages is one titled "Monthly PNL
Data" dated from November of 2014 through November of 2015,[92] as
Plaintiffs point out, this page does not identify

- The source of the profits and losses;

- The entity generating the profits and losses;

- The specific amounts of the profits and losses;

- The author of the document;

---

[91]Exhibit A of Defendants' Exhibits, Docket Entry No. 354-1,
pp. 7-33.

[92]Id. at 33.

- The date of the document;

- The source of the data contained in the document; or

- The identify of the person that provided it to Defendants.

. . . In fact, there is no evidence that the alleged profits and losses reflected in the document have anything whatsoever to do with energy trading. There is no evidence that the profits and losses were realized through the use of the Trader App. And there is no evidence connecting the Monthly PNL Data Sheet to Arya, Pallavi or Manoj.[93]

Because neither the declarations of Forero or Sargeant, nor the pages that Defendants have included in Exhibit A together with those declarations are capable of showing that Plaintiffs profited either from using the Trading Program to make their own trades or from selling or licensing the Trading Program to third parties, neither the Forero nor the Sargeant declarations nor the pages that follow those declarations in Defendants' Exhibit A are sufficient to raise a genuine issue of material fact for trial as to Defendants' damages.

> (B) Dufossat's Balance Sheets Do Not Provide Evidence of Damages

Citing Dufossat balance sheets dated December 31, 2014, December 31, 2015, and December 31, 2016, Defendants argue that the value of the software as indicated on those balance sheets provides

---

[93]Plaintiffs' Reply, Docket Entry No. 355, pp. 10–11.

evidence of damages that Dufossat is entitled to recover on its counterclaims for misappropriation of trade secrets, conversion of the Trader App, and conspiracy.[94]  While the balance sheets show amounts that Dufossat attributed to "software," Defendants have failed to cite evidence from which a reasonable jury could determine what, if any, of the amount attributed to "software" on Dufossat's balance sheets represents the value of the Trading Program that Plaintiffs misappropriated.  Moreover, since Defendants have failed to cite any evidence showing that Plaintiffs' misappropriation deprived Defendants of the ability to use the Trading Program, Defendants have similarly failed to cite any evidence from which a reasonable jury could conclude that the book value of Dufossat's software constitutes a reasonable measure of Defendants' damages.  Accordingly, the court concludes that the Dufossat balance sheets included in Defendants' Exhibit D are not sufficient to raise a genuine issue of material fact for trial as to Dufossat's damages.

> (C)  Manoj's Testimony Regarding a Trading
>       Loss Does Not Provide Evidence of Damages

Citing Manoj's deposition testimony, Defendants argue that "Manoj admitted that it was his job to monitor trading risk for the

---

[94]Defendants' Response, Docket Entry No. 353, pp. 15-17 (citing Exhibit D of Defendants' Exhibits, Docket Entry No. 354-4).

Dufossat Defendants,"[95] and that

> [e]ven though Manoj was responsible for managing risk, he
> allowed a trade to occur that resulted in a one-day
> trading loss of over $800,000.00. To be specific, Manoj
> testified as follows during his deposition taken on May
> 2, 2018:

> Q. The mistake he's talking about is an over
>    $800[,]000-trading loss on January 5th, 2016,
>    correct?

> A. Yes.

>         . . .

> Q. (BY MR. FORET) Did your -- was your job to monitor,
>    at this point, the risk of the trading, correct?

> A. Yes.

> Q. Okay. And if somebody was trading beyond the risk
>    profile you set up, you should have known about it,
>    correct?

> A. Yes.

>         . . .

> Q. Well, wasn't it your job to determine the risk in
>    the Follow Book?

> A. Yes.

> Q. Okay. So, again, if there was an overly risky
>    decision made here, it would have been your job to
>    -- to monitor that, correct?

> A. To advise Ashton [Soniat], yes, whether to take it
>    or not, yes.

> Q. Okay. And then you did not advise Ashton to take
>    this particular trading move, correct?
> A. What do you mean?

---

[95]Defendants' Response, Docket Entry No. 353, p. 18.

> Q.   You did not advise Ashton -- prior to this
>       occurring, you did not advise Ashton that the risk
>       related to this trade was too risky to take,
>       correct?
>
> A.   It wasn't too risky to take.[96]

Defendants argue that they are entitled to recoup as damages a one-day trading loss of $800,000.00 that Manoj intentionally caused, but fail to cite any evidence capable of establishing either that Manoj intended to cause the alleged loss, that the loss was anything more than an ordinary loss from daily trading activity, or that the loss was caused by breach of Manoj's fiduciary duty to Dufossat. Although Defendants attempted to have Manoj admit that he was responsible for the alleged loss, Manoj denied that the trade was too risky. Accordingly, Manoj's deposition testimony regarding a trading loss of $800,000.00 does not provide evidence of damages sufficient to raise a genuine issue of material fact for trial. Moreover, because Defendants have failed to cite evidence from which a reasonable jury could conclude that the trade was too risky, Defendants have failed to cite evidence capable of showing either that Manoj breached his fiduciary duty to Dufossat by intentionally causing a one-day trading loss, or that $800,000.00 is a reasonable measure of damages for any breach of Manoj's fiduciary duty to Dufossat.

---

[96]Defendants' Response, Docket Entry No. 353, p. 18 (quoting Oral Videotaped Deposition of Manoj Ghayalod, pp. 265:25-266:2, 266:8-266:15, and 267:24-268:13,  Exhibit E to Defendants' Exhibits, Docket Entry No. 354-5, pp. 4-7).

(D)   Arya's  Locking  Dufossat  Out  of  Email
System  Does  Not  Provide  Evidence  of
Damages

Asserting that Magistrate Judge Johnson found that "[t]here is
no dispute that Plaintiff Arya locked Defendants out of their e-
mail system for a few weeks in February 2016,"[97] and that "[t]he
dispute of fact regarding the extent of missing information in the
e-mail system will be left to the jury,"[98] Defendants argue that the
court should allow them to present evidence of damages that they
sustained when Plaintiffs locked them out of their email account.[99]
But apart from referencing their balance sheets, Defendants fail to
cite any evidence capable of establishing what, if any, damages
they suffered because Plaintiffs locked them out of their email
account.   Bare reference to Dufossat's balance sheets without
evidence of actual loss is not sufficient to raise a genuine issue
of material fact for trial regarding damages caused by a temporary
email interruption.   Speculative damages are not recoverable.   See
Berry-Helfand, 491 S.W.3d at 711 ("Damage estimates, however,
cannot be based on sheer speculation.   If too few facts exist to
permit the trier of fact to calculate proper damages, then a
reasonable remedy in law is unavailable.").   Moreover, as

---

[97]Defendants' Response, Docket Entry No. 353, p. 18 (citing
Memorandum and Recommendation, Docket Entry No. 237, p. 19).

[98]Id. (citing Memorandum and Recommendation, Docket Entry
No. 237, p. 20).

[99]Id. at 20.

44

Defendants themselves have recognized, any damages that they suffered as a result of the temporary email interruption are "incalculable"[100] and "cannot be reliably measured by any certain pecuniary standard."[101]   The fact that Plaintiffs temporarily interrupted Defendants' email does not provide evidence sufficient to raise a genuine issue of material fact for trial as to Defendants' damages.

### (3)   Conclusions

Defendants have failed to offer any evidence capable of establishing an amount of damages suffered as result of Plaintiff's conversion, misappropriation, and use of Defendants' trade secrets, Manoj's and Pallavi's alleged breach of contract, or Manoj's alleged breach of fiduciary duty.   Defendants have also failed to offer evidence capable of establishing the basic building blocks of any damage model, whether that be injuries or losses incurred by Defendants or benefits or profits earned by Plaintiffs.   Dufossat's principal, Soniat, testified that he has no evidence that Plaintiffs actually used the Trading Program to make energy trades:

> Q.   Well, this case has been pending for, let's see --
> March -- more than two years.   And you've had ample
> opportunity to conduct discovery, correct?

---

[100]Id. at 31.

[101]Id. at 28 (citing Temporary Restraining Order & Order Setting a Hearing for Temporary Injunction, Exhibit F to Defendants' Exhibits, Docket Entry No. 354-6).

45

A.    Correct.

Q.    Your lawyers have sent document requests to my --
to me and my client, right?

A.    (Indicating)

Q.    Correct?

A.    Correct.

Q.    You've deposed my client, correct?

A.    Correct.
Q.    You got[] sworn statements from third parties,
correct?

A.    Correct.

Q.    And over two years later, you don't have a single
piece of paper that backs up the allegation that
Arya has been trading on the electricity market
using the Trader app, correct?

      MR. FORET: Objection, form.

Q.    (BY MR. PEARSON) Do you have such documents or not?

A.    I don't.[102]

If there were no trades, there could be no profits.  Moreover,
there is no evidence that Manoj and Pallavi made any sales.  In
their SurReply, Defendants acknowledge that "none of the people
Pallavi and Manoj solicited had any interest in . . . joining
them."[103]  Accordingly, the court concludes that Defendants have

---

[102]Oral and Videotaped Deposition of Ashton Soniat ("Soniat
Deposition"), pp. 312:23-31319:, Exhibit E of Plaintiffs'
Exhibits, Docket Entry No. 352-5, pp. 8-9.

[103]Defendants' Motion to Strike and Surreply, Docket Entry
No. 364, p. 5.

46

failed to cite any evidence capable of raising genuine issues of material fact for trial as to the fact that Defendants suffered damages related to any of the counterclaims asserted in this action, or, if so, in what amount.

> 3.   <u>Defendants Have Failed to Cite Evidence Capable of Establishing that Pallavi Breached Either the Dufossat Operating Agreement or a Fiduciary Duty Owed to Dufossat</u>

Plaintiffs argue that Pallavi is entitled to summary judgment on Dufossat's claims for breach of the Dufossat Operating Agreement and for breach of fiduciary duty.[104]   Defendants respond that "Pallavi is a joint tortfeasor with her husband who also owed his own fiduciary duty to the Dufossat Defendants."[105]

> (a)   Defendants Have Failed to Present Facts Capable Proving that Pallavi Breached the Dufossat Operating Agreement

In support of their breach of contract claims against Pallavi, Dufossat alleges that

> [t]he Operating Agreement is a valid and enforceable contract that imposes contractual obligations on Manoj. Manoj agreed to be bound by the Operating Agreement in connection with his employment with Dufossat and receipt of ownership interests.    The Operating Agreement expressly prohibits Manoj from disclosing, directly or indirectly, any confidential, business information.  The Operating Agreement further prohibits Manoj from actively competing with Dufossat.    In consideration of these promises, Dufossat agreed to, and did, employ Manoj, and provide him with and give him access to Dufossat's confidential information and trade secrets.  Pallavi, by

---

[104]Plaintiffs' MSJ, Docket Entry No. 351, pp. 29-31; Plaintiffs' Reply, Docket Entry No. 355, pp. 29-30.

[105]Defendants' Response, Docket Entry No. 353, pp. 29-30.

virtue of signing the Spousal Assent, was also prohibited
from disclosing and/or using Dufossat's confidential
information without Dufossat's consent.

Manoj and Pallavi breached the Operating Agreement.
Such breaches include, without limitation, disclosing and
using Dufossat's confidential business information,
including its trade secrets and engaging and
participating in businesses involved in energy and
commodities trading other than through Dufossat.[106]

Asserting that Dufossat has alleged that Manoj and Pallavi
breached the confidentiality, non-disclosure, and non-compete
provisions of the Operating Agreement, that those provisions are
found in §§ 1.10, and 3.10, and that those sections define
obligations of Dufossat's members, managers, administrators,
officers, and designated key persons, Plaintiffs argue that none of
these provisions encompass the spouse of a member or impose any
duties on Pallavi.[107] Citing Wilshire Villa Association v. Strauss,
No. 94-40111, 1994 WL 612411, at *5 (5th Cir. October 24, 1994),
Plaintiffs argue that Pallavi is entitled to summary judgment in
her favor as a matter of law on Dufossat's claim for breach of the
Dufossat Operating Agreement because Pallavi's signature on the
Spousal Agreement does not impose on her any of the duties found in
§§ 1.20 or 3.10 of the Operating Agreement.[108]

_____

[106]Dufossat's Original Petition, Exhibit F to Counter-
Defendant's Notice of Removal filed in Civil Action 17-3553,
Docket Entry No. 1-8, pp. 20-21 ¶¶ 62-63 . See also Operating
Agreement, Exhibit J of Plaintiffs' Exhibits, Docket Entry
No. 352-10, and Spousal Assent and Affirmation, id. at 76.

[107]Plaintiffs' MSJ, Docket Entry No. 351, p. 30.

[108]Id. at 30-31.

In <u>Wilshire</u> a partnership sued the widow of one of its partners seeking past due partnership contributions. The partnership based its claim on the fact that the wife had signed a spousal assent stating that the partners' respective spouses "agree and obligate themselves to be bound by this agreement and all such acts of their respective spouses in connection with it." <u>Id.</u> at *4. The Fifth Circuit held that the spousal agreement did not make the partner's wife responsible for her husband's capital contributions:

> To say Mrs. Strauss is bound to the agreement is not to say she personally is bound to pay the contribution obligations imposed on partners. The evident purpose and plain meaning of this intervention provision is to relieve the partners from the need of obtaining spousal consent for partnership acts. The partnership agreement imposes the obligation to contribute capital on the partners, not their spouses. Nowhere in the agreement is there any language evidencing a promise by Mrs. Strauss to be bound personally for the debts of any partner, and we are unable to construe one from the language quoted above.

<u>Id.</u>

In pertinent part the Spousal Assent that Pallavi signed states that

> [t]he undersigned Spouse ("Spouse") of MANOJ GHAYALOD ("Member," . . .), hereby signs this ASSENT AND AFFIRMATION ("Assent") and joins in the execution of that certain Operating Agreement dated August 28, 2013, as may be amended from time-to-time ("Agreement") for the purposes of evidencing his or her knowledge of the Agreement's existence and substance after thorough inspection thereof; evidencing his or her acknowledgment that he or she agrees to the provisions contained in the Agreement; and affirming and/or re-affirming, as the case may be, the corporate documentation contained Company's

corporate Records ("Records"), including but not limited
to any restrictions on transfer of an interest or rights
of repurchase surrounding spouses.

.   .   .

. . . This Assent is intended solely as an assent,
affirmation and/or reaffirmation of the Agreement and the
Records.   It is not intended to, and shall not be
construed as, conferring, confirming or creating any
separate or community property interest in any ownership
interest of the Company in favor of the Member's Spouse.
Moreover, as is consistent with the Records, no further
consent or signature of Member's Spouse shall be required
with respect to any future action taken by such Member or
the Company under or in connection with this Agreement,
the Records or the Company.[109]

Like the spousal assent at issue in <u>Wilshire</u>, the Spousal Assent

that Pallavi signed was intended to relieve Dufossat or its members

from having to obtain her consent for Manoj's or Dufossat's acts.

For essentially the same reasons as those stated in <u>Wilshire</u>, the

court concludes that Pallavi's signature on the Spousal Assent does

not make her anything other than a third-party to the Operating

Agreement.   Accordingly, the court concludes that Plaintiffs are

entitled to summary judgment on the counterclaim for breach of the

Operating Agreement that Dufossat has asserted against Pallavi.


        (b)   Defendants Have Failed to Cite Facts Showing that
              Pallavi Breached a Fiduciary Duty Owed to Dufossat

    Dufossat's claim against Pallavi for breach of fiduciary duty

is similarly based in part on the Spousal Assent to the Operating

---

[109]Spousal Assent and Affirmation, Exhibit J of Plaintiffs'
Exhibits, Docket Entry No. 352-10, p. 76.

Agreement.  Defendants have failed to cite any authority in support
of their arguments that either Pallavi's signature on the Spousal
Assent or her status as Manoj's wife imposes on her a fiduciary
duty toward Dufossat.  Instead, Defendants argue that Pallavi owed
Dufossat a fiduciary duty

> by virtue of her business relationship with the Dufossat
> Defendants where she was provided with confidential
> information and provided with access to the Dufossat
> Defendants' e-mail account.  Pallavi breached the
> fiduciary duties that she owed to the Dufossat Defendants
> by, among other things, locking the Dufossat Defendants
> out of their e-mails system.[110]

Quoting Kinzback Tool Co. v. Corbett-Wallace Corp., 160 S.W.2d 509,
512-13 (Tex. 1942), Defendants argue that

> Pallavi not only had an independent fiduciary duty
> derived from the relationship of trust that Pallavi
> occupied when she was provided with confidential
> information and allowed to assume managerial control over
> Dufossat's e-mail account, she is also a joint tortfeasor
> with her husband who also owed his own fiduciary duty to
> the Dufossat Defendants.  "It is settled as the law of
> this State that where a third party knowingly
> participates in the breach of duty of a fiduciary, such
> third party becomes a joint tortfeasor with the fiduciary
> and is liable as such."
>
>     The facts in Kinzback bear a striking resemblance to
> the facts in the instant case.  In short, Turner,
> Kinzbach's trusted employee, permitted his employer to
> consummate a contract whereby it bought for $25,000 that
> which he, Turner, knew might be bought for $20,000.
> [Kinzback, 160 S.W.2d] at 513.  In return, Turner
> received a commission from Corbett, the seller of the
> equipment, that he failed to disclose to his employer.
> Id.  Similar to the disloyal employee in Kinzback, Manoj
> assisted Pallavi with: (1) hijacking Dufossat Capital's
> e-mail account and deleting or stealing confidential

---

[110]Defendants' Response, Docket Entry No. 353, p. 29.

data; (2) competing against Dufossat Capital;
(3) misappropriating Dufossat Capital's confidential
information not covered by TUTSA; and (4) removing
computers and other equipment from Dufossat's offices.
As a result of her actions, Pallavi is liable as a joint
tortfeasor.[111]

Defendants fail to cite any authority for the proposition that parties to commercial transactions such as those in which Dufossat engaged with Pallavi owe fiduciary duties to one another. "In certain formal relationships, such as an attorney-client or trustee relationship, a fiduciary duty arises as a matter of [Texas] law." Meyer v. Cathey, 167 S.W.3d 327, 330 (Tex. 2005) (per curiam). Texas law also recognizes "an informal fiduciary duty that arises from 'a moral, social, domestic or purely personal relationship of trust and confidence.'" Id. at 331 (quoting Associated Indemnity Corp. v. CAT Contracting, Inc., 964 S.W.2d 276, 287 (Tex. 1998)). However, Texas law "does not create such a relationship lightly." Id. "To impose an informal fiduciary duty in a business transaction, the special relationship of trust and confidence must exist prior to, and apart from, the agreement made the basis of the suit." Id. (quoting Associated Indemnity Corp. v. CAT Contracting, Inc., 964 S.W.2d 276, 288 (Tex. 1998)).

There is no evidence of a preexisting relationship between Dufossat and Pallavi, and the fact that Dufossat trusted Pallavi does not transform their business arrangement into a fiduciary

---

[111] Id. at 29-30.

relationship. Id. (citing Insurance Company of North America v. Morris, 981 S.W.2d 667, 674 (Tex. 1998) ("[M]ere subjective trust does not . . . transform arm's-length dealing into a fiduciary relationship.")). Moreover, agreements requiring confidentiality generally do not create fiduciary relationships. See, e.g., Wellogix, Inc. v. Accenture, LLP, 788 F.Supp.2d 523, 546 (S.D. Tex. 2011) (finding that a non-disclosure agreement did not give rise to a fiduciary relationship); Anglo-Dutch Petroleum International, Inc. v. Smith, 243 S.W.3d 776, 782 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) ("To the extent Smith's position equates a confidentiality agreement to a relationship of trust and confidence giving rise to a fiduciary duty, he has cited, and we have found, no authority supporting the notion that confidentiality agreements can create fiduciary relationships.").

In short, commercial dealings such as those described in the counterclaims that Dufossat asserts against Pallavi do not transform arm's length business transactions into a fiduciary relationship. See Wellogix, 788 F.Supp.2d at 545 (citing Meyer, 167 S.W.3d at 331). See also Crim Truck & Tractor Co. v. Navistar International Transportation Corp., 823 S.W.2d 479, 595 (Tex. 1992) ("The fact that one businessman trusts another, and relies upon his promise to perform a contract, does not rise to a confidential relationship. . . Every contract includes an element of confidence and trust that each party will faithfully perform his obligation

under the contract."). Accordingly, the court concludes that Plaintiffs are entitled to summary judgment on the breach of fiduciary duty counterclaim that Dufossat has asserted against Pallavi because Defendants have failed to cite evidence from which a reasonable jury could conclude that Pallavi owed Dufossat a fiduciary duty.

Defendants' contention that Pallavi may be held liable for breach of fiduciary duty as a joint tortfeasor with Manoj fails for the same reasons that the court has already concluded that Plaintiffs are entitled to summary judgment on the breach of fiduciary duty counterclaims asserted against Manoj, i.e., either because that counterclaim is preempted by TUTSA as stated above in § IV.B.1, or because Defendants have failed to cite evidence capable of establishing damages arising from Manoj's alleged breach of fiduciary duty as stated above in § IV.B.2.

## V. The Court Will Continue to Exercise Supplemental Jurisdiction

At the July 9, 2021, Docket Call the court observed, but did not address, the fact that all of the claims over which it had original jurisdiction had been stricken, and that pursuant to 28 U.S.C. § 1367(c)(3) it could decline to exercise supplemental jurisdiction over the remaining state law claims.[112]   On November

---

[112]Docket Call Official Reporter's Transcript of Proceedings, Docket Entry No. 367, pp. 26:10-30:2.

general rule in the Fifth Circuit is to dismiss state law claims
when the federal claims they supplement are dismissed.   See
Parker & Parsley Petroleum Co. v. Dresser Industries, 972 F.2d 580,
585 (5th Cir. 1992) (citing Wong v. Stripling, 881 F.2d 200, 204
(5th Cir. 1989)).   See also Brookshire Brothers Holding, Inc. v.
Dayco Products, Inc., 554 F.3d 595, 602 (5th Cir.), cert. denied,
129 S. Ct. 2865 (2009) ("The general rule is that a court should
decline to exercise jurisdiction over remaining state-law claims
when all federal law claims are eliminated before trial, but this
rule is neither mandatory nor absolute; . . .").   After carefully
considering the parties' arguments, the court will exercise
supplemental jurisdiction because the balance of factors to be
considered under the pendent jurisdiction doctrine -- judicial
economy, convenience, fairness, and comity -- all point toward
retaining jurisdiction over the remaining state-law claims.

Judicial economy strongly favors the court's exercise of
supplemental jurisdiction because this case has been pending for
over five years, and there has been extensive litigation during the
course of which the court has held multiple hearings, issued
multiple opinions, and ruled on multiple motions, including
voluminous motions in limine and, now, Plaintiffs' MSJ.   In
Brookshire Brothers the Fifth Circuit held that a district court
abuses its discretion if it declines to exercise supplemental
jurisdiction over state law claims remaining after dismissal of all

federal law claims when the court has already invested a "significant amount of judicial resources in the litigation." 554 F.3d at 602.

The extensive litigation already completed distinguishes this case from Parker & Parsley, where the court noted that "the case had been pending for only nine months," "the parties were not ready for trial," and "there is no indication that the district judge had substantial familiarity with the merits of the case." 972 F.2d at 587. Moreover, if the court were to enter a final judgment with respect to the federal claims and dismiss the state law claims without prejudice, there would likely be an immediate appeal to the Fifth Circuit, which would likely delay resolution of the state law claims in state court due to dispute over the effect of the court's Spoliation Order. By contrast, maintaining jurisdiction in this court will not only allow trial to be completed in a timely fashion, but also allow the effect of the Spoliation Order to be adjudicated as part of the overall case.

Convenience strongly favors the court's exercise of supplemental jurisdiction because this case has been pending for over five years, there have been 371 docket entries, and the case will soon be ready for trial. Dismissal of the remaining state law claims would cost the parties both time and money by requiring them to refile and litigate these claims in state court, and would likely substantially delay resolution of the state law claims.

Moreover, the delay that can reasonably be expected by dismissal of the remaining state law claims is likely to be exacerbated by the backlog of cases in the state courts caused by the on-going pandemic. See Parker & Parsley, 972 F.2d at 588 ("[I]n some cases the likelihood that backlogged state courts could not resolve the dispute promptly might be a factor weighing against dismissal.").

Fairness strongly favors the court's exercise of supplemental jurisdiction because dismissal of the remaining state law claims would likely lead not only to substantial delay in the resolution of those claims, but also to attempts to re-litigate the court's rulings, including the ruling made here on Plaintiff's MSJ. See Brookshire Brothers, 554 F.3d at 603 ("[O]ne more reason for reversing the remand order is that, if the order is not reversed, there is a significant risk that Brookshire will attempt to re-litigate in state court rulings made against it by the district court . . .").

Comity is at most neutral because the state law claims at issue are not novel or complex, and although state courts have an interest in resolving claims based on state law, that interest is not great enough to overcome the factors that strongly favor this court's retention of supplemental jurisdiction, i.e., judicial economy, convenience, and fairness.

## VI. **Conclusions and Order**

For the reasons stated in § II, above, the Dufossat Defendants' requests to file additional motions for summary judgment made in The Dufossat Defendants' Response to Plaintiffs' and Counter-Defendants' Motion for Summary Judgment on Defendants' Counterclaims and Brief in Support, Docket Entry No. 353, are **DENIED**.

For the reasons stated in § III, above, Defendants' Motion to Strike included in Docket Entry No. 364, is **DENIED**.

For the reasons stated in § IV, above, Plaintiffs' Motion for Summary Judgment is denied as to Dufossat's counterclaim for Declaratory Judgment that Dufossat owns the disputed software, but granted in all other respects, including Dufossat's counterclaim for damages arising from its receipt of Declaratory Judgment. Accordingly, Plaintiffs' and Counter-Defendants' Motion for Summary Judgment on Defendants' Counterclaims and Brief in Support, Docket Entry No. 351, is **GRANTED in PART** and **DENIED in PART**.

For the reasons stated in § V, above, the court will continue to exercise supplemental jurisdiction over the state law claims remaining in this action.

By Friday, February 4, 2022, the parties shall file (1) an Amended Joint Pretrial Order that reflects the rulings made herein and complies with the court's procedures; (2) Amended Exhibit Lists, Objections to Exhibits, and Witness Lists; and (3) a single,

joint    proposed    jury    charge,    including    all    instructions,
definitions, and questions.

Docket Call will be held on Friday, February 11, 2021, at 3:00
p.m. in Courtroom 9B of the United States Courthouse, 515 Rusk
Street, Houston, Texas 77002.

**SIGNED** at Houston, Texas, on this 30th day of December, 2021.

_____
SIM LAKE
SENIOR UNITED STATES DISTRICT JUDGE