United States District Court
Southern District of Texas
**ENTERED**
May 24, 2022
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ARYA RISK MANAGEMENT SYSTEMS, §
PVT. LTD., and WINCAB RISK §
SOLUTION, LLC, §
　 §
　　　Plaintiffs, §
　 §
v. § CIVIL ACTION NO. H-16-3595
　 §
DUFOSSAT CAPITAL PUERTO RICO, §
LLC, DUFOSSAT CAPITAL, LP, §
DUFOSSAT CAPITAL I, LLC, §
DUFOSSAT CAPITAL GP, LLC, §
and ASHTON SONIAT, §
　 §
　　　Defendants. §

## MEMORANDUM OPINION AND ORDER

Pending before the court are Defendants' Motion for Summary Judgment, ("Defendants' MSJ") (Docket Entry No. 384), Defendants' Motion to Strike Response of Manoj Ghayalod and, in the Alternative, Motion for Leave to Exceed the 25-Page Briefing Limit ("Defendants' Motion to Strike") (Docket Entry No. 390), Plaintiffs' Arya and Wincab's Motion for Leave to File Sur-Reply Relating to Defendants' Motion for Summary Judgment and Brief in Support ("Arya Plaintiffs' Motion to File Sur-Reply") (Docket Entry No. 394), and Plaintiff Manoj Ghayalod's Motion for Leave to File Summary Judgment Sur-Reply ("Manoj's Motion to File Sur-Reply") (Docket Entry No. 396). For the reasons stated below, Defendants' MSJ will be granted in part and denied in part, Defendants' Motion to Strike will be denied, Defendants' Motion for Leave to Exceed the 25-Page Briefing Limit will be granted, the Plaintiffs' motions to file sur-replies will be denied.

## I. **Factual and Procedural Background**

**A.   Factual Background**[1]

In 2009 Defendant Ashton Soniat ("Soniat") formed an energy and commodities trading company with Mark Schwausch ("Schwausch") named West Oaks Energy, L.P., ("West Oaks").[2]  Employees of West Oaks developed a computer program named "Victor," used between 2009 and 2012 to analyze market data and submit energy trades.[3]

In January of 2011 West Oaks hired Manoj Ghayalod ("Manoj") as Managing Director of Quantitative Research and Analytics.  Manoj and a team of up to seven programmers/traders, located in Houston, Texas, were responsible for continuing the development and optimization of "Victor."[4]  Soon after he was hired, Manoj suggested that West Oaks rewrite Victor's source code in a

---

[1]The facts set forth in this section are derived from the December 30, 2021, Memorandum Opinion and Order (Docket Entry No. 372) that resolved the Plaintiffs' motions for summary judgment, as modified on reconsideration by the February 7, 2022, Memorandum Opinion and Order (Docket Entry No. 383, p. 7), and supplemented by the "Undisputed Facts" set forth in Defendants' MSJ (Docket Entry No. 384, pp. 9-18).  All page numbers for docket entries in the record refer to the pagination inserted at the top of the page by the court's electronic filing system, CM/ECF.

[2]Dufossat's First Amended Counterclaim, Docket Entry No. 28, p. 2 ¶ 8.

[3]Id. at 4-5 ¶ 17.

[4]Defendants' MSJ, Docket Entry No. 384, p. 11 (citing Declaration of Mark Schwausch Under Penalty of Perjury ("Schwausch Declaration"), Exhibit A to Defendants' MSJ, Docket Entry No. 384-3, p. 3 ¶ 5).

different programming language.[5]  Manoj also suggested hiring
computer programmers in India as a cost-effective method of
optimizing West Oaks' computer software.  In order to facilitate
this suggestion, Manoj recommended that his wife, Pallavi Ghayalod
("Pallavi"), be hired to identify and recruit computer programmers
in India.[6]  In August of 2011 Pallavi formed two companies, Wincab,
a United States entity to bill West Oaks, and Arya Risk Management
Systems, Pvt. Ltd., ("Arya"), an Indian company to recruit, hire,
and employ programmers who would provide services to West Oaks.[7]
Manoj and/or Soniat "routinely reviewed the Indian Programmers'
resumes and work histories before any hires took place,"[8] and Manoj
"took the lead training the Indian Programmers."[9]

West Oaks later became Cobalt Capital Management Partners,
L.P., but continued to employ the programmers from India through
Plaintiff Arya, which paid the programmers' salaries and provided
them tools and training necessary for their work.  The programmers
rewrote the Victor program and developed a new trading program,

---

[5]Id. (citing Oral Deposition of Manoj Ghayalod, January 22,
2014 ("Manoj 2014 Deposition"), pp. 70:8-74:4, Exhibit C to
Defendants' MSJ, Docket Entry No. 384-5, pp. 20-21).

[6]Dufossat's First Amended Counterclaim, Docket Entry No. 28,
pp. 5-6 ¶ 21.

[7]Id. at 6 ¶ 23. See also Defendants' MSJ, Docket Entry
No. 384, p. 12 (citing Manoj 2014 Deposition, pp. 14:10-19:24,
Exhibit C to Defendants' MSJ, Docket Entry No. 384-5, pp. 6-7).

[8]Id. ¶ 25.

[9]Id. at 7 ¶ 27.

called "Trading Program" or "Trader App," which was released for use in mid-2012.[10]

In August of 2013 Soniat formed Defendant Dufossat Capital Puerto Rico, LLC, ("Dufossat").[11]

In October of 2013 Soniat and Schwausch agreed to cease doing business as West Oaks and/or Cobalt, part ways, and manage their own companies.[12]   Pursuant to a settlement agreement entered by Soniat and Schwausch, Manoj was to help Schwausch obtain a copy of the West Oaks/Cobalt computer software and data for his new company, Inertia Power LP ("Inertia").[13]   That same month Manoj received a 1% Class A Interest in Dufossat,[14] and Pallavi signed a spousal assent.[15]

In February of 2014 Arya registered the Trading Program with the United States Copyright Office by identifying itself as the author.  Arya never informed Soniat of the copyright registration.[16]

---

[10]Id. at 3 ¶ 11 and 6-8 ¶¶ 24-29.

[11]Dufossat Capital Puerto Rico, LLC, Operating Agreement ("Operating Agreement"), Exhibit G to Defendants' MSJ, Docket Entry No. 384-9, pp. 2 (Effective Date: August 28, 2013).

[12]Dufossat's First Amended Counterclaim, Docket Entry No. 28, p. 8 ¶ 31.

[13]Id. at 8-10 ¶¶ 32-35.

[14]Operating Agreement, p. 64, Exhibit G to Defendants' MSJ, Docket Entry No. 384-9, p. 67.

[15]Dufossat's First Amended Counterclaim, Docket Entry No. 28, pp. 9-10 ¶ 35.

[16]Id. at 11 ¶ 41.

In May of 2014 Manoj received an additional 2.5% Class A Interest in Dufossat.[17]   In addition, Soniat agreed to convert Manoj's $200,000 salary to an annual guaranteed payment of $250,000 for a minimum of five years, provided that Manoj was not otherwise in violation of the Dufossat Operating Agreement and remained working full time for Dufossat.[18]   The parties refer to this agreement variously as the Unanimous Consent Resolution and the Guaranteed Payment Agreement.

In June of 2014 Arya offered to provide Dufossat with quantitative trading analysts ("Quants") who were trained to use the Trading Program and to recommend trades based on the program's analysis of market information.   The parties entered an agreement whereby Arya Quants provided trade recommendations in exchange for payment from Dufossat.   Plaintiffs allege that Dufossat agreed to pay Arya thirty percent of all profits made on the recommended trades, but Dufossat disputes that allegation.   Defendants recorded trades recommended by Arya Quants separately from other accounts, but, without Arya's knowledge and without paying Arya, Defendants duplicated the trades in larger quantities in what is referred to variously as the "Shadow Book" and the "Follow Book."[19]

---

[17]Operating Agreement, p. 65, Exhibit G to Defendants' MSJ, Docket Entry No. 384-9, p. 68.

[18]Unanimous Consent, p. 1, Exhibit H to Defendants' MSJ, Docket Entry No. 384-10, p. 2.

[19]Plaintiffs' Second Amended Complaint, Docket Entry No. 26,
(continued...)

In December of 2015 Dufossat proposed a written agreement "to memorialize its business relationship with Arya" that described the Trading Program as a work made for hire.[20]  Arya refused to sign the agreement and, instead, proposed a services agreement that identified the Trading Program as belonging to Arya.  The parties were unable to reach an agreement.[21]

Defendants allege that by late January of 2016 they determined that Manoj was not performing his duties as an employee, a minority owner, or a risk officer and, thereby, had cost Dufossat millions of dollars.[22]  Dufossat claims to have halted the services of the Quants at that time.  In early February of 2016 Soniat, without warning to Arya, prevented the programmers' access to Dufossat's computer software and data.[23]  Shortly thereafter, Manoj and Pallavi removed laptop and desktop computers from Dufossat's offices. Dufossat responded by changing the office locks.  Manoj and Pallavi then locked Dufossat out of its email system.[24]

---

[19](...continued)
pp. 5-6 ¶¶ 18-24.

[20]Id. at 4 ¶ 16.  See also Dufossat's First Amended Counterclaim, Docket Entry No. 28, p. 13 ¶ 42.

[21]Plaintiffs' Second Amended Complaint, Docket Entry No. 26, p. 4 ¶ 17.

[22]Dufossat's First Amended Counterclaim, Docket Entry No. 28, p. 12 ¶ 43.

[23]Id. ¶ 44.

[24]Id. at 13-14 ¶ 45.

On February 24, 2016, Dufossat terminated Manoj's employment with cause, but Manoj remained a minority interest owner of the company.[25] Later in 2016 Arya formed companies for marketing the Trading Program on the internet.[26]

After Manoj's termination and discontinuance of Defendants' relationship with Arya, Defendants continued using the Trading Program and hired former Arya Quants to provide the services they had been providing through Arya.[27]

## B.   Procedural Background

This case is a consolidation of two separate lawsuits described in the August 22, 2019, Memorandum and Recommendation (Docket Entry No. 237), in which Magistrate Judge Johnson recommended the imposition of sanctions on Plaintiffs for spoliation of evidence.[28]  On September 26, 2019, the court entered an Order Adopting Magistrate Judge Johnson's Memorandum and Recommendation ("Spoilation Order") (Docket Entry No. 247).  In

---

[25]Id. & n. 4.  See also February 24, 2016, Letter to Manoj, Exhibit 22 to Oral Videotaped Deposition of Manoj Ghayalod, May 2, 2018 ("Manoj 2018 Deposition"), Exhibit I to Defendants' MSJ, Docket Entry No. 384-11, pp. 163-64.

[26]Dufossat's First Amended Counterclaim, Docket Entry No. 28, pp. 13-14 ¶¶ 46-49.

[27]Plaintiffs' Second Amended Complaint, Docket Entry No. 26, p. 7 ¶ 26.

[28]See also Defendants' Memorandum of Law, Docket Entry No. 371, pp. 5-7 (describing the parties' multiple actions).

brief, the Arya Plaintiffs filed this action against all the Defendants on December 7, 2016 (Docket Entry No. 1).   The Arya Plaintiff's live pleading is Plaintiffs' Second Amended Complaint (Docket Entry No. 26).   The live pleading for the counterclaims that the Defendants have asserted against the Arya Plaintiffs is Dufossat's First Amended Counterclaim, (Docket Entry No. 28). Manoj filed suit against Dufossat and Soniat in the 284th Judicial District of Montgomery County, Texas, Cause No. 16-03-03657. Dufossat and Soniat sought and received leave to add Pallavi as a party, and Pallavi removed the state court action to this court as Case No. 4:17-cv-3553, which was subsequently consolidated with this action (Docket Entry No. 77).   Manoj's live pleading is Plaintiff's First Amended Petition from the state court action,[29] and Defendants' live pleading therefrom is Dufossat Capital Puerto Rico, LLC's Original Petition Against Pallavi Ghayalod.[30]

At Docket Call on July 9, 2021, the court allowed Plaintiffs to file a motion for summary judgment on any dispositive issues.[31]

On December 30, 2021, the court entered a Memorandum Opinion and Order (Docket Entry No. 372) that resolved the Plaintiffs' motions for summary judgment, as modified on reconsideration by the

---

[29]Docket Entry No. 1-10, pp. 58-71 in Civil Action No. 17-3553.

[30]Exhibit F to Counter-Defendant's Notice of Removal, Docket Entry No. 1-8 in Civil Action No. 17-3553.

[31]Docket Call Transcript, Docket Entry No. 367, p. 20:15-17.

February 7, 2022, Memorandum Opinion and Order (Docket Entry
No. 383, p. 7). Upon reconsideration the court allowed Defendants
to file the pending motion for summary judgment.[32]

## II. **Defendants' Motion to Strike**

Asserting that the court's order allowing them to file the
pending MSJ contemplated one motion that would be subject to a
single response from Plaintiffs and a single reply, and that all
the motions would be subject to the court's 25-page limit, but that
Plaintiffs filed two responses that, together, exceed the 25-page
limit by seven pages, Defendants move the court to strike the
response filed by Manoj, and to grant their MSJ on Manoj's claims
for failure to respond.[33] Alternatively, Defendants move the court
for leave to exceed the 25-page briefing limit by filing
Defendants' Reply to Manoj's Response to Defendants' Motion for
Summary Judgment attached as Exhibit A to Defendants' Motion to
Strike (Docket Entry No. 390-2).[34]

District courts may, in the exercise of sound discretion,
grant motions to strike pleadings. See Gezu v. Charter
Communications, 17 F.4th 547, 555 (5th Cir. 2021)(citing Cambridge

---

[32]Memorandum Opinion and Order, Docket Entry No. 383, pp. 5-
6.

[33]Defendants' Motion to Strike, Docket Entry No. 390, pp. 2-
4.

[34]Id. at 4.

<u>Toxicology Group, Inc. v. Exnicios</u>, 495 F.3d 169, 178 (5th Cir. 2007) ("This court reviews a motion to strike for abuse of discretion.")).   Although Defendants are correct that the court intended for them to file one MSJ, and for Plaintiffs to jointly file one response, to which Defendants would file one reply, Defendants have failed to show prejudice from Plaintiffs' filing two responses, one for the Arya Plaintiffs and one for Manoj, and acknowledge that the court could ameliorate any prejudice by allowing them to file two replies.[35] Because contrary to Defendants' argument, failure to respond is not alone cause to grant a motion for summary judgment, striking Manoj's response would neither serve the interests of justice nor expedite the resolution of this action.   See <u>Luera v. Kleberg County, Texas</u>, 460 F. App'x 447, 449 (5th Cir. 2012)(per curiam)("We have approached the automatic grant of a dispositive motion, such as a grant of summary judgment based solely on a litigant's failure to respond, with considerable aversion; and we have permitted such dismissals only when there is a record of extreme delay or contumacious conduct.").   Accordingly, Defendants' Motion to Strike will be denied and Defendants' Motion for Leave to Exceed the 25-Page Briefing Limit by filing Defendants' Reply to Manoj's Response to Defendants' Motion for Summary Judgment attached as Exhibit A to Defendants' Motion to Strike will be granted.

---

[35]<u>Id.</u>

### III. <u>**Plaintiffs' Motions for Leave to File Sur-Replies**</u>

The Arya Plaintiffs and Manoj each move for leave to file sur-replies to the replies that Defendants have filed in support of their MSJ. Although surreplies "are heavily disfavored," <u>Warrior Energy Services Corp. v. ATP TITAN M/V</u>, 551 F. App'x 749, 751 n. 2 (5th Cir. 2014)(per curiam), district courts may, in the exercise of sound discretion, grant motions for leave to file such additional briefing. <u>See</u> <u>Austin v. Kroger Texas, L.P.</u>, 864 F.3d 326, 336 (5th Cir. 2017) (per curiam)(finding that the district court did not abuse its discretion by denying a party's motion to file a surreply because the other party "did not raise any new arguments in its reply brief"); <u>RedHawk Holdings Corp. v. Schreiber Trustee of Schreiber Living Trust</u>, 836 F. App'x 232, 233 (5th Cir. 2020) (per curiam) ("The district court abused its discretion by granting Schreiber's motion . . . based exclusively on arguments and evidence presented for the first time in Schreiber's reply brief without allowing RedHawk to file a surreply."). While "[a]rguments raised for the first time in a reply brief are generally waived," <u>Jones v. Cain</u>, 600 F.3d 527, 541 (5th Cir. 2010), "granting leave to file a sur-reply in extraordinary circumstances on a showing of good cause is a viable alternative to the general practice to summarily deny or exclude all arguments and issues first raised in reply briefs." <u>Silo Restaurant Inc. v. Allied Property and Casualty Insurance Co.</u>, 420 F.Supp.3d 562, 571 (W.D. Tex. 2019) (quotation marks and citations omitted).

11

**A.    The Arya Plaintiffs' Motion for Leave to File Sur-Reply**

The Arya Plaintiffs seek leave to file a sur-reply to address three arguments that they contend Defendants made for the first time in their Reply Brief:

- the argument that the Declaration of Pallavi Ghayalod should be stricken as a "sham affidavit;"

- the argument that Plaintiffs have offered no competent summary judgment evidence to support the existence of an agreement to pay Arya 30% of the Follow Book profits; and

- the argument that TUTSA [the Texas Uniform Trade Secretes Act] preempts claims based on the misappropriation of confidential information as well as trade secrets.[36]

The Arya Plaintiffs urge the court to "recall that Defendants filed a motion for leave to file a sur-reply addressing Plaintiffs' similar summary judgment motion[, . . . and that t]he Court granted that motion and allowed Plaintiffs to file a ten-page response to the sur-reply. . . The Court should do the same here."[37]

Defendants argue that the Arya Plaintiffs Motion to File Sur-Reply should be denied because their reply brief raised no new arguments or evidence but, instead, specifically addressed and rebutted arguments that the Arya Plaintiffs made in response to Defendants' MSJ.[38]   Alternatively, "Defendants request that they be

---

[36]Arya Plaintiffs' Motion to File Sur-Reply, Docket Entry No. 394, p. 4.

[37]Id.

[38]Defendants' Response to Plaintiffs' Motion for Leave to
(continued...)

allowed an opportunity to file a Sur-Response of appropriate corresponding length."[39]

For the reasons stated in § IV.B, below, the court has been able to resolve Defendants' MSJ in the Arya Plaintiffs' favor without relying on the Declaration of Pallavi Ghayalod to which Defendants object, and without reference to any of the arguments made in their proposed sur-reply. Accordingly, the Arya Plaintiffs' motion for leave to file sur-reply will be denied, mooting Defendants' request to file an sur-response.

**B.   Manoj's Motion for Leave to File Sur-Reply**

Manoj seeks leave to file a sur-reply arguing that Defendant's reply "contained new summary judgment evidence."[40]

Defendants respond that Manoj's Motion to File Sur-Reply should be denied because "it cites no legal support and is based on misstatements about the content of Defendants' [MSJ]."[41] Alternatively, Defendants seek leave to file a sur-response.[42]

---

[38](...continued)
File Sur-Reply, Docket Entry No. 395, p. 2.

[39]Id. at 8.

[40]Manoj's Motion to File Sur-Reply, Docket Entry No. 396, p. 1.

[41]Defendants' Response to Plaintiff Manoj Ghayalod's Motion for Leave to File Sur-Reply, Docket Entry No. 398, p. 2.

[42]Id.

Neither Manoj's Motion to File Sur-Reply nor his proposed Sur-Reply identify new arguments or evidence that Defendants' raised for the first time in their reply.  Moreover, Manoj's proposed sur-reply fails to do more than restate arguments made in his response to Defendants' MSJ.  For example, "[r]elating to Argument 'K' in Defendants' MSJ" Manoj argues that "Defendants' Reply contains new evidence.  Manoj need not address it, however, because at best it simply conflicts with Manoj's sworn Declaration . . ."[43]  "Relating to Arguments 'L' and 'M' in Defendants' MSJ," Manoj argues that "Defendants' Reply contains more new evidence. . . Manoj stands on the evidence, authority and arguments raised in his Response."[44] Because these arguments show that Manoj lacks good cause to file a sur-reply, Manoj's Motion to File a Sur-Reply will be denied.

## IV. **Defendants' Motion for Summary Judgment**

### A.   **Standard of Review**

Summary judgment is authorized if the movant establishes that there is no genuine dispute about any material fact, and the law entitles it to judgment.  Fed. R. Civ. P. 56.  Factual disputes are "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty

---

[43]Plaintiff Manoj Ghayalod's Summary Judgment Sur-Reply, Docket Entry No. 396-1, p. 3.

[44]Id.

Lobby, Inc., 106 S. Ct. 2505, 2511 (1986).  The Supreme Court has interpreted the plain language of Rule 56 to mandate the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2552 (1986). A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (quoting Celotex, 106 S. Ct. at 2553-2554).  If the moving party meets this burden, the nonmovant must go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, or other admissible evidence that facts exist over which there is a genuine issue for trial.  Id.  "[T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  Reeves v. Sanderson Plumbing Products, Inc., 120 S. Ct. 2097, 2110 (2000).  Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." Little, 37 F.3d at 1075.

15

**B.  Defendants Are Not Entitled to Summary Judgment on the Arya Plaintiffs' Remaining Claims**

The Arya Plaintiffs' live complaint, Plaintiffs Second Amended Complaint filed on April 5, 2017 (Docket Entry No. 26), asserts 18 causes of action ("COA") which are listed in the December 30, 2021, Memorandum Opinion and Order (Docket Entry No. 372).  In response to Defendants' MSJ the Arya Plaintiffs state that they intend to proceed to trial on only the following five claims:

- Breach of the Quant Services Agreement against Dufossat (COA 10);

- Quantum meruit regarding Quant Services (COA 12);

- Unjust enrichment regarding Quant Services (COA 13);

- Fraudulent inducement relating to the Quant Services Agreement (COA 16);

- Tortious interference with the Quant Services Agreement by Soniat (COA 18).[45]

Defendants argue that they are entitled to summary judgment on all of the Arya Plaintiffs' causes of action because (1) TUTSA preempts all of their  tort and quasi-contract claims as they are all based on the purported unauthorized use of Arya's confidential information, (2) any claims not preempted by TUTSA are precluded by the existence of the parties' Quant Services Agreement, and (3) Plaintiffs' breach of contract claims are precluded by the

---

[45]Plaintiffs' Arya and Wincab's Response to Defendants' Motion for Summary Judgment and Brief in Support ("Arya Plaintiffs' Response to Defendants' MSJ"), Docket Entry No. 385, p. 9.

affirmative defenses of prior material breach of contracts, waiver, and laches.[46]  Defendants argue that

> [a]fter the application of TUTSA and the other arguments raised by Defendants in their [MSJ], the only remaining claim to be tried is Plaintiffs' TUTSA claim for the Follow Book trades — which according to Plaintiffs have been abandoned.  All of Plaintiffs' other claims should be dismissed with prejudice in favor of Defendants.[47]

### 1.   The Arya Plaintiffs' Claims are Not Preempted by TUTSA

Defendants argue that the Arya Plaintiffs' tort and quasi-contract causes of action are all preempted by TUTSA because they are predicated on trade secret misappropriation.[48]  Citing various paragraphs of the Arya Plaintiffs' live complaint, Defendants argue that

> [t]he Arya Plaintiffs allege the Quant trade recommendations "constituted trade secrets as that term is defined under Texas law," which is fatal for all Surviving Tort claims.  Because the Arya Plaintiffs contend that the Quant's trade recommendations constitute trade secrets under Texas law and have incorporated them as the basis for each of their Surviving Tort Claims, all such claims are preempted by TUTSA.[49]

Defendants also argue that the Arya Plaintiffs cannot meet the

---

[46]Defendants' MSJ, Docket Entry No. 384, p. 9.  See also Defendants' Reply to Plaintiffs' Response to Defendants' Motion for Summary Judgment ("Defendants' Reply"), Docket Entry No. 389, p. 7.

[47]Defendants' Reply, Docket Entry No. 389, pp. 7-9.

[48]Defendants' MSJ, Docket Entry No. 384, p. 20.

[49]Id. at 21 (citing Plaintiffs' Second Amended Complaint, Docket Entry No. 26, pp. 5-7 ¶¶ 20, 25-27; 12-13 ¶¶ 46-47 and 50-51; 20-21 ¶¶ 77 and 80).

predicate to support attorney's fees under TUTSA, but that they are entitled to attorney's fees for the Arya Plaintiffs' bad faith TUTSA claims.[50]

The Arya Plaintiffs respond that their remaining causes of action are not preempted by TUTSA because they seek contractual remedies, their causes of action are not dependent on the existence of a trade secret or its misappropriation, and Defendants cannot prove that the energy trade recommendations were trade secrets.[51]

(a)   Applicable Law

The TUTSA, which became effective in 2013, governs claims for trade secret misappropriation in Texas.   Tex. Civ. Prac. & Rem. Code §§ 134A.001 et seq.   TUTSA defines "misappropriation" as:

(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) disclosure or use of a trade secret of another without express or implied consent by a person who:

(i) used improper means to acquire knowledge of the trade secret;

(ii) at the time of disclosure or use, knew or had reason to know that the person's knowledge of the trade secret was:

---

[50]Id. at 9.   See also Defendants' Reply, Docket Entry No. 389, pp. 8-15.

[51]Arya Plaintiffs' Response to Defendants' MSJ, Docket Entry No. 385, pp. 9-21.

18

> (a) derived from or through a person who used improper means to acquire the trade secret;
>
> (b) acquired under circumstances giving rise to a duty to maintain the secrecy of or limit the use of the trade secret; or
>
> (c) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of or limit the use of the trade secret; or
>
> (iii) before a material change of the position of the person, knew or had reason to know that the trade secret was a trade secret and that knowledge of the trade secret had been acquired by accident or mistake.

Tex. Civ. Prac. & Rem. Code §§ 134A.002(3).

TUTSA defines trade secrets as "all forms and types of information" that the owner "has taken reasonable measures . . . to keep . . . secret," and which "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." Tex. Civ. Prac. & Rem. Code §§ 134A.002(6).

TUTSA's preemption provision states that

> (a)  Except as provided by Subsection (b), this chapter displaces conflicting tort, restitinary, and other law of this state providing civil remedies for misappropriation of a trade secret.
>
> (b)  This chapter does not affect:
>
> > (1)  contractual remedies, whether or not based upon misappropriation of a trade secret;
> >
> > (2)  other civil remedies that are not based upon misappropriation of a trade secret; or

>    (3)  criminal  remedies,  whether  or  not  based  upon
>    misappropriation of a trade secret.

Tex. Civ. Prac. & Rem. Code § 134A.007.  Because TUTSA's exemption provision does not apply to "contractual remedies, whether or not based  upon  misappropriation  of  a  trade  secret,"  the  Arya Plaintiffs' claim against Dufossat for breach of the Quant Services Agreement is not preempted.  The Arya Plaintiffs' other state law claims for quantum meruit, unjust enrichment, fraudulent inducement and  exemplary  damages  relating  to  the  Quant  Services  Agreement asserted against Dufossat, and for tortious interference with the Quant Services Agreement and exemplary damages asserted against Soniat are preempted only if they are "based upon misappropriation of a trade secret.  Id. at § 134A.007(a).  See also AMID, Inc. v. Medic Alert Foundation United States, Inc., 241 F.Supp.3d 788, 825 (S.D. Tex. 2017)("[A] claim is not preempted if the plaintiff is able  to  show  the  claim  is  based  on  facts  unrelated  to  the misappropriation of the trade secret."); 360 Mortgage Group, LLC v. HomeBridge Financial Services, Inc., No. A-14-CA-00847-SS, 2016 WL 900577, at *7 (W.D. Tex. March 2, 2016) (finding that claims for conversion,  unjust  enrichment,  and   constructive  trust  were preempted by TUTSA because they were based on the same underlying harm — taking confidential information, but that the plaintiff's remaining claims for breach of contract, tortious interference with contract,  breach  of  fiduciary  duty,  and  conspiracy  were  not preempted by TUTSA).

(b)   Application of the Law to the Facts

    (1)   Plaintiffs' Claims for Quantum Meruit
        Regarding Quant Services are Not Preempted

Defendants argue that the Arya Plaintiffs' quantum meruit claims regarding Quant Services are preempted by TUTSA because those claims are predicated on the assertion that "Arya provided valuable services to Defendants by supplying Defendants with recommended UTC trades compiled by the . . . Quants,"[52] and because the Arya Plaintiffs have also alleged that "[t]hese trade recommendations are trade secret[s] under Texas law."[53] Asserting that "[n]either the recognized elements of a quantum meruit . . . claim . . . nor the facts Plaintiffs pled to support those claims require a showing of the existence or misappropriation of a trade secret,"[54] the Arya Plaintiffs argue that their claims for quantum meruit related to Quant Services are not preempted by TUTSA because whether the Quants' trade recommendations were trade secrets is immaterial to their quasi-contractual claims for quantum meruit.[55]

---

[52]Defendants' MSJ, Docket Entry No. 384, p. 22 & nn. 93-94 (citing Plaintiffs' Second Amended Complaint, Docket Entry No. 26, pp. 18-19 ¶¶ 70-72).

[53]Id. & n. 95 (citing Plaintiffs' Second Amended Complaint, Docket Entry No. 26, pp. 5-7 ¶¶ 20-27; 12 ¶¶ 46-47; and 20-21 ¶¶ 77 and 80).

[54]Arya Plaintiffs' Response to Defendants' MSJ, Docket Entry No. 385, p. 17.

[55]Id.

"Quantum Meruit is an equitable remedy that is 'based upon the promise implied by law to pay for beneficial services rendered and knowingly accepted.'"  Hill v. Shamoun & Norman, LLP, 544 S.W.3d 724, 732 (Tex. 2018) (quoting In re Kellogg Brown & Root Inc., 166 S.W.3d 732, 740 (Tex. 2005)).  "The purpose of this common law doctrine is to prevent a party from being 'unjustly enriched' by 'retain[ing] the benefits of the . . . performance without paying anything in return.'"  Id. (quoting Truly v. Austin, 744 S.W.2d 934, 938 (Tex. 1988)).  To recover on their quantum meruit claims for Quant Services the Arya Plaintiffs must prove that

> (1)  valuable services were rendered or materials furnished;
>
> (2)  for the person sought to be charged;
>
> (3)  those services and materials were accepted by the person sought to be charged, and were used and enjoyed by him; and
>
> (4)  the person sought to be charged was reasonably notified that the plaintiff performing such services or furnishing such materials was expecting to be paid by the person sought to be charged.

Id. at 732-33 (citing Vortt Exploration Co., Inc. v. Chevron U.S.A., Inc., 787 S.W.2d 942, 944 (Tex. 1990)).  A party generally cannot recover under a quantum meruit claim when there is a valid contract covering the services or material furnished.  Id. at 733 (citing In re Kellogg Brown & Root, 166 S.W.3d at 740).  "The measure of damages for recovery under a quantum-meruit theory is the reasonable value of the work performed or the materials furnished."  Id.

In support of their quantum meruit claims regarding Quant Services the Arya Plaintiffs allege that

> to the extent there was not a valid and enforceable contract between Plaintiffs and Defendants, Plaintiffs should recover for quantum meruit. Arya provided valuable services to Defendants by supplying Defendants with recommended UTC trades compiled by the Arya Quants. These services were provided specifically for Defendants, and Defendants accepted these services. Defendants had reasonable notice that Plaintiffs expected to be paid for these services. . .
>
> As a consequence of the above facts, Plaintiffs are entitled to recover their actual damages, which are in excess of the jurisdictional limits of this Court, under the doctrine of quantum meruit, for which they now sue together with attorneys' fees and pre and post-judgment interest at the lawful rate. Plaintiffs state that they are entitled to recover the reasonable value of the Quant Services provided to Arya in an amount not less than 30% of the profit on all trades recommended by the Arya Quants, including any Shadow Trades . . .[56]

Because neither the facts that the Arya Plaintiffs must prove nor the facts that they allege in support of their claims for quantum meruit regarding Quant Services are based on an alleged misappropriation of trade secrets but, instead, on allegations that Defendants failed to pay for Quant services rendered, the Arya Plaintiffs' claims for quantum meruit regarding Quant Services are

---

[56]Plaintiffs' Second Amended Complaint, Docket Entry No. 26, pp. 18-19 ¶¶ 71-72. These pleadings also assert that the Arya Plaintiffs provided defendants with IT services and that they seek the reasonable value for those services, but pursuant to the statement in their response to Defendants' MSJ that they intend to proceed to trial on only five listed claims, the Arya Plaintiffs have abandoned claims for breach of any IT Services Agreement. See Arya Plaintiffs' Response to Defendants' MSJ, Docket Entry No. 385, p. 9.

51not preempted by the TUTSA.  <u>See</u> <u>Fox Controls, Inc. v. Honeywell,</u> <u>Inc.</u>, No. 02 C 346, 2004 WL 906114, *2 (N.D. Ill. April 26, 2004) (claims for quantum meruit and unjust enrichment were not barred by trade secrets act because they were "not based on misappropriation, but simply on allegations that Fox Controls was not paid for services that it rendered to Honeywell").  Defendants' argument that the Arya Plaintiffs' claims for quantum meruit regarding Quant Services are preempted because the Arya Plaintiffs alleged that the Quants' recommendations are trade secrets is unavailing because that argument is based on excerpts from claims for misappropriation and theft of trade secrets that are no longer at issue, and because the Arya Plaintiffs' quantum meruit claims do not require proof that the Quants recommendations were either trade secrets or misappropriated.

> (2) Plaintiffs' Claims for Unjust Enrichment Regarding Quant Services are Not Preempted

Defendants argue that the Arya Plaintiffs' unjust enrichment claims are preempted by TUTSA because those claims are  predicated on the assertion that "Defendants . . . received a benefit by making UTC trades based on the . . . Quants' recommendations,"[57] and that "[t]hese trade recommendations are trade secret[s] under Texas

---

[57]Defendants' MSJ, Docket Entry No. 384, p. 22 & nn. 96-97 (citing Plaintiffs' Second Amended Complaint, Docket Entry No. 26, p. 19 ¶¶ 73-75).

law."[58]  Asserting that "[n]either the recognized elements of a[n]
. . . unjust enrichment claim nor the facts Plaintiffs pled to
support those claims require a showing of the existence or
misappropriation of a trade secret,"[59] the Arya Plaintiffs argue
that their claims for unjust enrichment are not preempted by TUTSA
because whether the Quants' trade recommendations were trade
secrets is immaterial to their quasi-contractual unjust enrichment
claims.[60]

    "A party may recover under the unjust enrichment theory when
one person has obtained a benefit from another by fraud, duress, or
the taking of an undue advantage."  Heldenfels Brothers, Inc. v.
City of Corpus Christi, 832 S.W.2d 39, 41 (Tex. 1992) (citing Pope
v. Garrett, 211 S.W.2d 559, 562 (Tex. 1948), and Austin v. Duval,
735 S.W.2d 647, 649 (Tex. App. — Austin 1987, writ denied)).  See
also Digital Drilling Data Systems, L.L.C. v. Petrolink Services,
Inc., 965 F.3d 365, 379-80 (5th Cir. 2020) (same).

> Unjust enrichment is an equitable principle holding that
> one who receives benefits unjustly should make
> restitution for those benefits. . .
>
> "Unjust enrichment" occurs when the person sought to be
> charged has wrongfully secured a benefit or has passively
> received one which it would be unconscionable to retain.

---

[58]Id. & n. 98 (citing Plaintiffs' Second Amended Complaint,
Docket Entry No. 26, pp. 5-7 ¶¶ 20-27; 12 ¶¶ 46-47; and 20-21
¶¶ 77 and 80).

[59]Arya Plaintiffs' Response to Defendants' MSJ, Docket Entry
No. 385, p. 17.

[60]Id.

> . . "Unjust enrichment" characterizes the result or
> failure to make restitution of benefits received under
> such circumstances as to give rise to [an] implied or
> quasi-contract to repay . . .

Villarreal v. Grant Geophysical, Inc., 136 S.W.3d 265, 270 (Tex.

App. — San Antonio 2004, pet denied) (quotation marks and citations

omitted).  See also Digital Drilling, 965 F.3d at 384 ("In Texas an

action for unjust enrichment is based upon the equitable principle

that a person receiving benefits which were unjust for him to

retain ought to make restitution.") (quotation marks and citation

omitted).

In support of their unjust enrichment claims the Arya

Plaintiffs allege that

> to the extent there was not a valid and enforceable
> contract between Plaintiffs and Defendants, Plaintiffs
> should recover for unjust enrichment.  Defendants
> wrongfully secured and/or passively received a benefit by
> making UTC trades based on the Arya Quants'
> recommendations . . . Defendants would be unjustly
> enriched if they are not required to pay for the Quant
> Services . . . and it would be unconscionable for
> Defendants to retain these benefits. Defendants obtained
> these benefits from Arya by fraud, duress, or the taking
> of undue advantage by secretly making additional trades
> in the Shadow Book . . .
>
> As a consequence of the above facts, Plaintiffs are
> entitled to recover their actual damages, which are in
> excess of the jurisdictional limits of this Court, under
> the doctrine of unjust enrichment, for which they now sue
> together with attorneys' fees and  pre and post-judgment
> interest at the lawful rate.  Plaintiffs state that they
> are entitled to recover the reasonable value of the Quant
> Services provided to Arya in an amount not less than 30%
> of the profit of all trades recommended by the Arya
> Quants, including any Shadow Trades. . .[61]

---

[61]Defendants' MSJ, Docket Entry No. 384, p. 19 ¶¶ 74-75.
(continued...)

Because neither the facts that the Arya Plaintiffs must prove nor the facts that they allege in support of their claims for unjust enrichment regarding Quant Services are based on an alleged misappropriation of trade secrets but, instead, on allegations that Defendants

> wrongfully secured and/or passively received a benefit by making UTC trades based on the Arya Quants' recommendations[, that] Defendants would be unjustly enriched if they are not required to pay for the Quant Services[, and that] Defendants obtained these benefits from Arya by fraud, duress, or the taking of undue advantage by secretly making additional trades in the Shadow Book,[62]

the Arya Plaintiffs' claims for unjust enrichment regarding Quant Services are not preempted by the TUTSA.  See Zenimax Media, Inc. v. Oculus VR, LLC, 166 F. Supp.3d 697, 706 (N.D. Tex. 2015) (unjust enrichment claim was not barred by TUTSA where plaintiffs had alleged that the defendant had "been unjustly enriched by receiving the benefits of Plaintiffs' research, technical guidance, and other valuable support, without compensating Plaintiffs for the benefits received").  See also Fox Controls, 2004 WL 906114, at *2 (claims

---

[61](...continued)
These pleadings also assert that the Arya Plaintiffs provided defendants with IT services and that they seek the reasonable value for those services, but pursuant to the statement in their response to Defendants' MSJ that they intend to proceed to trial on only five listed claims, the Arya Plaintiffs have abandoned claims for breach of any IT Services Agreement.  See Arya Plaintiffs' Response to Defendants' MSJ, Docket Entry No. 385, p. 9.

[62]Defendants' MSJ, Docket Entry No. 384, p. 19 ¶ 74.

for quantum meruit and unjust enrichment were not barred by trade secrets act because they were "not based on misappropriation, but simply on allegations that Fox Controls was not paid for services that it rendered to Honeywell"). See also Digital Drilling, 965 F.3d at 380 (holding that the plaintiff's unjust enrichment claim was not preempted by the Copyright Act because  it "requires establishing that [the defendant] engaged in wrongful conduct beyond mere reproduction: namely, the taking of an undue advantage"). Defendants' argument that the Arya Plaintiffs' claims for unjust enrichment regarding the Quant Services Agreement are preempted because the Arya Plaintiffs alleged that the Quants' recommendations are trade secrets is unavailing because that argument is based on excerpts from claims for misappropriation and theft of trade secrets that are no longer at issue, and because the Arya Plaintiffs' unjust enrichment claims do not require proof that the Quants' recommendations were trade secrets or misappropriated.

> (3)   Plaintiffs' Claims for Fraudulent Inducement
>        and Exemplary Damages Are Not Preempted

Defendants argue that the Arya Plaintiffs' claims for fraud regarding Quant Services are preempted by TUTSA because those claims are predicated on the assertion that the Arya Plaintiffs "provided Quants 'to provide Defendants with recommended UTC trades' and that Dufossat would pay for the 'trade

28

recommendations,'"[63] and because the Arya Plaintiffs have also alleged that "[t]hese trade recommendations are trade secret[s] under Texas law."[64]   Asserting that their fraud claims are not dependent on the existence of a trade secret or its misappropriation, the Arya Plaintiffs argue that their fraud claims are not preempted by TUTSA because their fraud claims allege that "Defendants agreed to the terms of the Quant Services Agreement, and induced Plaintiffs to agree to them, even though they had no intention of performing the contract."[65]

"Fraudulent inducement 'is a particular species of fraud that arises only in the context of a contract and requires the existence of a contract as part of its proof.'"   IAS Services Group, L.L.C. v. Jim Buckley & Associates, Inc., 900 F.3d 640, 647 (5th Cir. 2018) (quoting Bohnsack v. Varco, L.P., 668 F.3d 262, 277 (5th Cir. 2012)(quoting Haase v. Glazner, 62 S.W.3d 795, 798 (Tex. 2001))). To recover on their claim for fraudulent inducement regarding the Quant Services Agreement the Arya Plaintiffs must prove

(1)   a misrepresentation that defendant knew was false;

(2)   the defendant intended to induce plaintiff to enter into the contract through that misrepresentation;

---

[63]Id. at 22 & nn. 99-100 (citing Plaintiffs' Second Amended Complaint, Docket Entry No. 26, p. 22 ¶¶ 82-84).

[64]Id. & n. 101 (citing Plaintiffs' Second Amended Complaint, Docket Entry No. 26, pp. 5-7 ¶¶ 20-27; 12 ¶¶ 46-47; and 20-21 ¶¶ 77 and 80).

[65]Arya Plaintiffs' Response to Defendants' MSJ, Docket Entry No. 385, p. 15.

<blockquote>
(3)    the plaintiff actually relied on the misrepresentation in entering into the contract;

(4)    plaintiff's reliance on the misrepresentation led plaintiff to suffer an injury through entering into the contract;

(5)    plaintiff's reliance on the misrepresentation must be a material factor in the plaintiff's decision to enter into a contract.
</blockquote>

See <u>Bohnsack v. Varco, L.P.</u>, 668 F.3d 262, 277 (5th Cir. 2012).  A fraud claim may also be based on the failure to disclose a material fact that defendant had a duty to disclose.  See <u>Spoljaric v. Percival Tours, Inc.</u>, 708 S.W.2d 432, 435 (Tex. 1986).

In support of their fraud claim the Arya Plaintiffs allege that

<blockquote>
[i]n or around June 2014, Arya approached Defendants and offered to provide trading analysts called "Quants" who could be trained by Arya to use the Trading Program to provide Defendants with recommended UTC trades.  Arya agreed to provide to Dufossat recommended UTC trades formulated through quantitative analysis of market information.  Soniat agreed that Dufossat would pay Arya 30% of all profits made by Defendants on Arya's trade recommendations.  Upon information and belief, Soniat's promises were fraudulent because Soniat and Dufossat, at the time the promises were made, had no intent of performing the agreement.  Plaintiffs relied on Soniat's representations to their detriment by training the Arya Quants and providing valuable services to Defendants.  Such reliance was reasonable, forseeable and intended by Defendants.

Defendants' acts of fraud have caused Plaintiffs actual damages for which they now sue together with prejudgment and post-judgment interest.  Plaintiffs are also entitled to and hereby seek an award of exemplary damages in an amount to be determined by the trier of fact.[66]
</blockquote>

---

[66]Plaintiffs' Second Amended Complaint, Docket Entry No. 26,
(continued...)

The Arya Plaintiffs' claims for fraudulent inducement to enter the Quant Services Agreement are not preempted by TUTSA because neither the facts that the Arya Plaintiffs must prove nor the facts that they allege in support of their claims for fraudulent inducement are based on an alleged misappropriation of trade secrets but, instead, on allegations that Defendants agreed to pay 30% of all profits made on the Arya Quant's trade recommendations, that when Defendants made the agreement they had no intent of performing the agreement, and that the Arya Plaintiffs reasonably relied on Defendants' misrepresentations to their detriment by training the Quants and providing valuable services to Defendants for which Defendants failed to pay.  See MedioStream, Inc. v. Microsoft Corp., 749 F.Supp.2d 507, 515 (E.D. Tex. 2010) (court refused to dismiss the plaintiff's fraudulent inducement claim on preemption grounds because it was "not based on an identical nucleus of facts" as plaintiff's misappropriation of trade secrets claim).  Defendants' argument that the Arya Plaintiffs' claims for fraudulent inducement and related exemplary damages are preempted by the TUTSA because the Arya Plaintiffs alleged that the Quants' recommendations are trade secrets is unavailing because that argument is based on excerpts from claims for misappropriation and theft of trade secrets that have been abandoned and are no longer

---

[66](...continued)
p. 22 ¶¶ 83-84.

at issue, and because the Arya Plaintiffs' fraudulent inducement claims do not require proof that the Quants' recommendations were` either trade secrets or misappropriated.

> (4)  Plaintiffs' Claims for Tortious Interference and Exemplary Damages are Not Preempted

Defendants argue that the Arya Plaintiffs' claims for tortious interference and exemplary damages asserted against Soniat are preempted by TUTSA because "[t]he Arya Plaintiffs predicate this claim on the assertion that Soniat used the 'trades recommended by Arya' from the 'Quant Services to Dufossat' [to] make the trades in the Follow Book,"[67] and that "[t]hese trade recommendations are trade secret[s] under Texas law."[68]  The Arya Plaintiffs argue that their claims for tortious interference and exemplary damages with respect to the Quant Services Agreement asserted against Soniat are not preempted by TUTSA because those claims are based on allegations that Soniat maliciously caused Dufossat to breach the Quant Services Agreement by refusing to pay Arya the agreed 30% of profits generated by the Shadow Trades that Dufossat made and concealed from Arya and are not dependent on the existence of a

---

[67]Defendants' MSJ, Docket Entry No. 384, p. 23 & nn. 105-06 (citing Plaintiffs' Second Amended Complaint, Docket Entry No. 26, pp. 23-24 ¶¶ 88-92).

[68]Id. & n. 107 (citing Plaintiffs' Second Amended Complaint, Docket Entry No. 26, pp. 5-7 ¶¶ 20-27; 12 ¶¶ 46-47; and 20-21 ¶¶ 77 and 80).

trade secret or its misappropriation.[69]

To recover on their claim for tortious interference with an existing contract asserted against Soniat, the Arya Plaintiffs must prove

    (1)   an existing contract subject to interference,

    (2)   a willful and intentional act of interference with the contract,

    (3)   that proximately caused the plaintiff's injury, and

    (4)   caused actual damages or loss.

Prudential Insurance Co. of America v. Financial Review Services, Inc., 29 S.W.3d 74, 77 (Tex. 2000) (citing ACS Investors, Inc. v. McLaughlin, 943 S.W.2d 426, 430 (Tex. 1997)).  See also IEDA Enterprises, Inc. v. Dallas Roadster, Ltd. (Matter of Dallas Roadster, Ltd.), 846 F.3d 112, 127 (5th Cir. 2017) (same).

In support of their claims for tortious interference and exemplary damages asserted against Sonia, the Arya Plaintiffs allege that

> . . . [T]here was a contract between Plaintiffs and Dufossat for Arya to provide Quant Services to Dufossat. Dufossat was to make the trades recommended by Arya on the Arya Book and was to pay 30% of its profits.
>
> Soniat directed and arranged for the shadow trades to be made in the Shadow Book in an attempt to personally enrich himself at the expense of both Plaintiffs and Dufossat. . . Soniat intended to utilize the profits generated by the shadow trades for his own personal benefit rather than for the benefit of Dufossat.

---

[69]Arya Plaintiffs' Response to Defendants' MSJ, Docket Entry No. 385, p. 13.

Soniat's actions were so contrary to Dufossat's best
interests that his actions could only have been motivated
by personal interests. As a result of the foregoing
acts, despite the relationship between Soniat and
Dufossat, Soniat was legally capable of tortiously
interfering with the contract between Dufossat and Arya.
. . . .

By directing and arranging for the shadow trades to
be made in the Shadow Book with the intent that
Plaintiffs would not receive payment for its share of the
profits Dufossat made on the shadow trades, Soniat
tortiously interfered with the agreement between Dufossat
and Plaintiffs. Soniat intentionally and tortiously
interfered with the agreement by causing a breach of the
agreement's term and by making Dufossat's performance of
its duties thereunder impossible. Soniat's acts of
interference were neither privileged nor justified.
Moreover, they were carried out with actual malice as
that term is defined by Texas law.

Soniat's acts of tortious interference have caused
Plaintiffs actual damages in excess of the jurisdictional
minimum of this Court for which they now sue together
with prejudgment and post-judgment interest. Moreover,
because Soniat's acts of tortious interference were
carried out with actual malice, Plaintiffs are entitled
to and hereby seek an award of exemplary damages in an
amount to be determined by the trier of fact.[70]

The Arya Plaintiffs' claims for tortious interference with

contract asserted against Soniat are not preempted by TUTSA because

neither the facts that the Arya Plaintiffs must prove nor the facts

alleged in support of the claims for tortious interference asserted

against Soniat are based upon Soniat's use of the Arya Plaintiff's

trade secrets. Instead, the Arya Plaintiffs' claims for tortious

interference with contract are based on allegations that there was

---

[70]Plaintiffs' Second Amended Complaint, Docket Entry No. 26,
pp. 23-24 ¶¶ 89-92.

a contract between Plaintiffs and Dufossat for Arya to provide Quant Services to Dufossat, that Dufossat was to make trades recommended by Arya on the Arya Book and pay Arya 30% of its profits, that Soniat intentionally and maliciously directed and arranged for shadow trades to be made in the Shadow or Follow Book in an attempt to personally enrich himself, that Soniat's actions tortiously interfered with the agreement between Dufossat and Plaintiffs by making Dufossat's performance of its duties thereunder impossible, and that Soniat's acts of tortious interference caused Plaintiffs actual damages. See 360 Mortgage Group, 2016 WL 900577, at *7 ("Because Plaintiff's claims for both breach of contract and tortious interference with contract depend on the existence and content of a written agreement, these claims are not preempted by Plaintiff's claim for trade secret misappropriation under TUTSA."). See also Haws & Garrett General Contractors, Inc. v. Gorbett Brothers Welding Co., 480 S.W.2d 607, 609 (Tex. 1972) ("Our courts have recognized that the real difference between express contracts and those implied in fact is in the character and manner of proof required to establish them."). Defendants' contention that the Arya Plaintiffs' claims for tortious interference with the Quant Services Agreement and related exemplary damages are preempted by TUTSA because the Arya Plaintiffs alleged that the Quants' recommendations are trade secrets is unavailing because that argument is based on excerpts

35

from claims for misappropriation and theft of trade secrets that are no longer at issue, and because tortious interference with contract is a contractual remedy not preempted by TUTSA. <u>See</u> Tex. Civ. Prac. & Rem. Code § 134A.007(b)(1).

    2.    <u>Defendants Have Not Shown that They Are Entitled to Attorneys' Fees as a Matter of Law on the Arya Plaintiffs' TUTSA Claims</u>

Asserting that TUTSA permits a prevailing party to recover reasonable attorney's fees if "a claim of misappropriation is made in bad faith,"[71] and citing both Plaintiff's Second Amended Complaint filed on April 5, 2017, and the September 26, 2019, Order Adopting Magistrate Judge's Memorandum and Recommendation (Docket Entry No. 247), Defendants argue that they are entitled to attorneys fees because they prevailed on the Arya Plaintiffs' TUTSA claims concerning the use of the trading software and the Trader App copyright, and because "Arya continues to assert claims against Dufossat based [on] use of the Trader App Copyright."[72]

The Arya Plaintiffs respond that Defendants are not entitled to an award of attorneys fees because Defendants fail to make any showing that the Arya Plaintiffs brought their misappropriation claims in bad faith or that they have continued to prosecute those claims following adoption of Magistrate Judge Johnson's

---

[71]Defendants' MSJ, Docket Entry No. 384, p. 29.

[72]<u>Id.</u>

recommendation to grant the Trader App copyright to the Defendants.[73] The Arya Plaintiffs argue that because they "have not prosecuted their misappropriation claims after the Court granted the Trader App copyright to Defendants, [Defendants'] Motion [for summary judgment seeking attorneys' fees for bad faith prosecution of their misappropriation claims] should be denied."[74]   Because Defendants' only evidence that the Arya Plaintiffs have asserted TUTSA claims in bad faith is Plaintiffs Second Amended Complaint, which was filed on April 5, 2017, almost two and a half years before this court adopted Magistrate Judge Johnson's recommendation to grant Defendants judgment on the misappropriation claims, Defendants have failed to cite evidence establishing that the Arya Plaintiffs brought their misappropriation claims in bad faith or that Defendants are entitled to attorneys fees for that reason.

     3.   <u>Defendants Have Not Shown that the Express Contract Bar</u> <u>Entitles Them to Summary Judgment on the Arya Plaintiffs'</u> <u>Quantum Meruit and Unjust Enrichment Claims</u>

Asserting that "when a valid, express contract covers the subject matter of the parties' dispute, there can be no recover[y] under a quasi-contract theory,"[75] Defendants argue that "the express

---

[73]Arya Plaintiffs' Response to Defendants' MSJ"), Docket Entry No. 385, pp. 31-32.

[74]<u>Id.</u> at 32.

[75]Defendants' MSJ, Docket Entry No. 384, p. 23.

contract[] between Arya and Dufossat for the . . . Quant services bar[s] recovery."[76]  The Arya Plaintiffs respond that the express contract bar does not entitled the Defendants to summary judgment because that is an affirmative defense that Defendants did not assert in their Answer, Defendants have denied the existence of an express contract, and Defendants have failed to show that the shadow trades were within the scope of any express contract.[77]  In reply Defendants reiterate that the existence of an express contract bars the Arya Plaintiffs' quasi-contract claims, the Arya Plaintiffs have been on notice of their express contract defense since 2017, and the existence of even an implied-in-fact contract bars the quasi-contract claims.[78]

While "[a] party generally cannot recover under a quantum meruit claim when there is a valid contract covering the services or materials furnished," Hill, 544 S.W.3d at 733, "[w]hen the existence of or the terms of a contract are in doubt, and there is a claim for unjust enrichment, it is incumbent on the party disputing that claim to secure findings from the trial court that an express contract exists that covers the subject matter of the dispute." Fortune Production Co. v. Conoco, Inc., 52 S.W.3d 671,

---

[76]Id. at 24.

[77]Arya Plaintiffs' Response to Defendants' MSJ, Docket Entry No. 385, pp. 21-24.

[78]Defendants' Reply, Docket Entry No. 389, pp. 15-18.

685 (Tex. 2000).  Defendants have failed to meet this burden by citing evidence establishing as a matter of law the existence, terms, or scope of either an express or an implied-in-fact contract for the Arya quant services.

As evidence of an express contract for Quant Services, Defendants cite the deposition of Pallavi, and an email that Soniat sent to Pallavi on April 7, 2014.[79]  But the evidence on which Defendants rely does not establish the existence, terms, or scope of a contract for Quant services.  To the contrary, the excepts from Pallavi's deposition on which Defendants rely concern a contract for IT services, not the contract for Quant Services, and the portions of Pallavi's deposition that address the Quant Services Agreement show that Pallavi insisted that she and Soniat had an oral agreement that she would be paid 30% of all profits made from Arya quant trade recommendations.[80]  The April 7, 2014, email on which Defendants rely contains only Pallavi's proposal to hire an individual quant, and Soniat's two-word response: "Hire him."[81]  In response to the Arya Plaintiffs' First Request for

_____

[79]Defendants' MSJ, Docket Entry No. 384, p. 24 & n. 114 (citing Videotaped Oral Deposition of Pallavi Ghayalod, May 3, 2018 ("Pallavi Deposition"), pp. 273:12-274:11, Exhibit D to Defendants' MSJ, Docket Entry No. 384-6, p. 70; and Exhibit 34 thereto, Docket Entry No. 384-6, pp. 82-84).

[80]See Pallavi Deposition, pp. 192:14-194:17, Exhibit D to Defendants' MSJ, Docket Entry No. 384-6, pp. 49-50.

[81]April 7, 2014, Email, Exhibit H to Arya Plaintiffs'
(continued...)

Admissions, Dufossat admitted that there were no written contracts between Arya and Dufossat or between Arya and Soniat regarding quant services,[82] and Defendants have repeatedly argued that the terms of the parties' Quant Services Agreement are in dispute.[83] Moreover, in the reply filed in support of the pending motion for summary judgment, Defendants state that "the parties dispute some of the terms of the Quant Services Agreement (specifically, whether there was an agreement for 30% of all trade recommendation profits or only a percentage bonus of trade recommendations profits in the Arya Book.)"[84]

Although the parties agree that they had an agreement for Quant services, the summary judgment record does not contain a written contract for Quant services, Dufossat has admitted that there were no written contracts between Arya and Dufossat or

---

[81](...continued)
Response to Defendants' MSJ, Docket Entry No. 386-8.  This email is also Exhibit 34 to Pallavi Deposition, Docket Entry No. 384-6, pp. 82-85.

[82]Dufossat Capital Puerto Rico, LLC Objections and Responses to Arya Risk Management Systems, PVT. LTD.'s First Request for Admission, p. 4, Exhibit D to Arya Plaintiff's Response to Defendants' MSJ, Docket Entry No. 386-4, p. 5 ¶¶ 3-4.

[83]See Defendants' Motion to Reconsider the Court's December 30, 2021, Memorandum Opinion and Order, Docket Entry No. 377, p. 4 ¶ 18; and Memorandum Opinion and Order, Docket Entry No. 383, p. 7.

[84]Defendants' Reply, Docket Entry No. 389, p. 17.

between Arya and Soniat regarding Quant Services,[85] and both Pallavi and Soniat have testified that the parties agreement for Quant services was an oral agreement.[86]  Moreover, Defendants acknowledge that material terms of the agreement — including the price to be paid and the scope of the agreement, _i.e._, whether the agreement applied only to the Arya Book or whether it also applied to the Follow or Shadow Book — are in dispute.[87]  Where, as here, material terms — including the price to be paid and the scope of the contract — are in dispute, the existence of the contract itself is at issue.  See Liberto v. D.F. Stauffer Biscuit Co., Inc., 441 F.3d 318, 324 (5th Cir. 2006) ("Texas courts have consistently held that a contract may be held void for indefiniteness if it fails to specify the time of performance, the price to be paid, the work to be done, the service to be rendered, or the property to be

---

[85]Dufossat Capital Puerto Rico, LLC Objections and Responses to Arya Risk Management Systems, PVT. LTD.'s First Request for Admission, p. 4, Exhibit D to Arya Plaintiff's Response to Defendants' MSJ, Docket Entry No. 386-4, p. 5 ¶¶ 3-4.

[86]See Pallavi Deposition, pp. 194:16-17, Exhibit D to Defendants' MSJ, Docket Entry No. 384-6, pp. 49-50; and Oral and Videotaped Deposition of Ashton Soniat ("Soniat Deposition"), pp. 128:1-136:18, Exhibit A to Arya Plaintiffs' Response to Defendants' MSJ, Docket Entry No. 386-1, pp. 33-35.

[87]See Joint Pretrial Order, Docket Entry No. 346, p. 9 (Arya Plaintiffs contend they are entitled to payment relative to the Follow Book; Defendants contend that the Arya Plaintiffs were not entitled to payment relative to the Follow Book); and 15 (Dufossat's contested issues of fact include "[w]hether there is a contract between Arya (and/or Wincab and other related parties) and Dufossat for payment of 30% related to the Quant trades").

transferred."). Where the existence of a contract is in dispute, the express contract bar does not apply and a party is permitted to proceed in the alternative both on a breach of contract theory and a quasi-contract theory, as the Arya Plaintiffs are attempting to do here. See In re Kellogg Brown & Root Inc., 166 S.W.3d 732, 740 (Tex. 2005) ("A party to a contract may . . . seek alternative relief under both contract and quasi-contract theories."). Whether the Arya Plaintiffs are entitled to recover on their quantum meruit and unjust enrichment claims will depend on the jury's determination of questions regarding the existence, terms, and scope of the Quant Services Agreement.

> 4. Defendants Have Not Shown that They are Entitled to Summary Judgment on the Arya Plaintiffs' Claims for Breach of the Quant Services Agreement

Defendants argue that they are entitled to summary judgment on the Arya Plaintiffs' claims for breach of the Quant Services Agreement because (1) the Arya Plaintiffs cannot support that claim;[88] and (2) that claim is barred by the affirmative defenses of prior breach,[89] waiver, and laches.[90]

---

[88]Defendants' MSJ, Docket Entry No. 384, pp. 25-26.

[89]Id. at 27-28.

[90]Id. at 28-29.

(a)  Breach of Contract

Asserting that "the sole memorialization of the parties' agreement is the April 7, 2014, e-mail wherein Arya offered to obtain quants to provide Quant Services at the terms identified therein, which Dufossat accepted,"[91] Defendants argue that "[t]he parties' agreement contains nothing about '30% of all profits made by Dufossat on Arya's trade recommendations,' contrary to the Arya Plaintiffs' assertion in their pleading."[92]

The Arya Plaintiffs respond that "Defendants are not entitled to summary judgment on [their] claim for breach of the Quant Services Agreement based on an isolated email relating to the hiring of a single Quant."[93]  Citing Soniat's and Dufossat's Responses to their first requests for production and admissions, and Soniat's deposition testimony, the Arya Plaintiffs argue that "Defendants have repeatedly admitted that the parties had a ***verbal agreement*** and an ***established course of conduct*** relating to the Quant Services whereby Dufossat was to pay Arya 30% of the profits made from the Arya Quants' energy trade recommendations."[94]  Citing

---

[91]Id. at 25 (citing April 7, 2014, e-mail, Exhibit 34 to Pallavi Deposition, Exhibit D, Docket Entry No. 384-6, pp. 82-85).

[92]Id. (quoting Plaintiffs' Second Amended Complaint, Docket Entry No. 26, p. 5 ¶ 18).  See also Defendants' Reply, Docket Entry No. 389, pp. 18-23.

[93]Arya Plaintiffs' Response to Defendants' MSJ, Docket Entry No. 385, p. 24.

[94]Id.

the July 2, 2021, Joint Pretrial Order, the Arya Plaintiffs argue that "[u]ntil now, Defendants have never disputed the 30% agreement; they have only disputed whether the agreement covered the separate Shadow Trades made by Dufossat in the Follow Book of which Arya was unaware."[95]

Defendants' are not entitled to summary judgment on the Arya Plaintiffs' breach of contract claims because for the reasons stated in § IV.B.3, above the court has already concluded that the April 7, 2014, email fails to establish as a matter of law the existence, material terms, or scope of the Quant Services Agreement.  Moreover, Defendants' arguments that the parties' agreement "contains nothing about 30% of all profits made by Dufossat on Arya's trade recommendations,"[96] is contradicted by Soniat's deposition testimony.  When questioned about Dufossat's responses to interrogatories posed by the Arya Plaintiffs, Soniat appears to confirm that Dufossat agreed to pay the Arya Plaintiffs 30% of the net profits of trades recommended by the Arya Quants:

> Q.   Can you go back to Exhibit 19 for me?  And again, these are your responses to Arya's — your responses to Arya's first set of interrogatories, correct?
>
> A.   Yes.

---

[95]Id. at 26 (citing Defendants' Contentions in the Joint Pretrial Order, Docket Entry No. 346, p. 9).

[96]Defendants' MSJ, Docket Entry No. 384, p. 25 (citing April 7, 2014, e-mail, Exhibit 34 to Pallavi Deposition, Exhibit D, Docket Entry No. 384-6, pp. 82-85).

> Q.   And if you go to Page 4, the very bottom, the very
>      last partial paragraph, it says: Beginning in April
>      2014, Arya began recruiting and hiring trading
>      analysts in India for Dufossat (referred to as
>      quants).  The quants were Arya's employees, and
>      Arya agreed to assign the quants to work for
>      Dufossat.
>
>      Am I good so far?
>
> A.   Yes.
>
> Q.   And do you agree with that so far?
>
> A.   I do.
>                            . . .
>
> Q.   Beginning in January 2015, Wincab began invoicing
>      Dufossat approximately every quarter for
>      performance payments attributable to the work done
>      by the quants.  Wincab and/or Arya determined the
>      amount of each performance payment invoice.  Based
>      on discussions between Pallavi Ghayalod, Manoj
>      Ghayalod, and/or Ashton Soniat, the amount of each
>      performance payment invoice was supposed to be
>      equal to 30 percent of the net profits and losses
>      on the trades submitted by the quants in portfolios
>      on Dufossat's risk system/Trader app minus a fee
>      per megawatt traded.
>
> A.   Correct.
>
> Q.   And do you agree with what I just read?
>
> A.   Yes.[97]

Soniat also testified that in late 2015 or early 2016 he had his

lawyers draft a written agreement to govern the relationship

between Arya and Dufossat that reflected the way they had been

---

[97]Soniat Deposition, pp. 128:23–130:13, Exhibit A to Arya
Plaintiffs' Response to Defendants' MSJ, Docket Entry No. 386-1,
pp. 33-34.  See also id. at 135:19-20 (stating that the parties'
Quant Service Agreement included an agreement to pay "30 percent
of their book minus the — the cost per megawatt").

operating,[98] that the shadow trade account belonged to Dufossat,[99] and that the draft contract included a provision pursuant to which Dufossat would pay 30% of net profits for quant-recommended trades.[100]

### (b)   Affirmative Defenses

Defendants move for summary judgment on the affirmative defenses of excuse due to prior breach, waiver, and laches. Because Defendants bear the burden of proving affirmative defenses at trial, in moving for summary judgment Defendants "must establish beyond peradventure <u>all</u> of the essential elements of the . . . defense to warrant judgment in [their] favor." <u>Fontenot v. Upjohn Co.,</u> 780 F.2d 1190, 1194 (5th Cir. 1986).

### (1)  **Prior Breach**

Asserting that the Arya Plaintiffs' claims for breach of contract are barred by their prior material breaches, Defendants argue that "[t]he Arya Plaintiffs' prior material breaches excuse the Defendants' performance under those contracts."[101]   The Arya

---

[98]<u>Id.</u> at 97:14-98:11, 163:19-164:11, Docket Entry No. 386-1, pp. 26 and 42.

[99]<u>Id.</u> at 174:17-25, Docket Entry No. 386-1, p. 45.

[100]<u>Id.</u> at 179:17-180:18, Docket Entry No. 386-1, p. 46.

[101]Defendants' MSJ, Docket Entry No. 384, p. 27.

Plaintiffs respond that Defendants are not entitled to summary judgment based on excuse due to prior material breach because that is an affirmative defense that Defendants failed to assert in their Answer, Defendants cannot prove any prior breach of the Quant Services Agreement that would excuse their future performance, and prior material breach is inapplicable because Defendants allowed the Arya Plaintiffs to continue performing Quant Services after any supposed breach.[102]

"A fundamental principle of contract law is that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from any obligation to perform." Matter of Dallas Roadster, 846 F.3d at 127 (quoting Hernandez v. Gulf Group Lloyds, 875 S.W.2d 691, 692 (Tex. 1994)). What constitutes a breach of contract is a question of law, but whether the breaching conduct occurred and whether a breach is material are questions of fact. Id. (citing X Technologies, Inc. v. Marvin Test Systems, Inc., 719 F.3d 406, 413-14 (5th Cir. 2013), and Henry v. Mason, 333 S.W.3d 825, 835 (Tex. App. — Houston [1st Dist.] 2010, pet. denied)). See also Bartush-Scnitzius Foods Co. v. Cimco Refrigeration, Inc., 518 S.W.3d 432, 436-37 (Tex. 2017) (per curiam) (discussing prior material breach). To determine whether a breach is material, Texas courts consider the five

---

[102]Arya Plaintiffs' Response to Defendants' MSJ, Docket Entry No. 385, pp. 26-28.

factors articulated in <u>Mustang Pipeline Co. v. Driver Pipeline Co.</u>[, 134 S.W.3d 195, 199 (Tex. 2004)]:

> (a) the extent to which the injured party will be deprived of the benefit he reasonably expected;
>
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
>
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
>
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of the circumstances including any reasonable assurances; [and]
>
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

<u>Henry</u>, 333 S.W.3d at 835.

Defendants fail to cite any evidence capable of establishing that the Arya Plaintiffs breached the Quant Services Agreement. Instead, Defendants merely assert that

> [w]hen Arya used the Trader App copyright and the other trade secret[s] it acquired from Dufossat to provide Quant Services to market Arya to third parties, such as Greg Forero and Harry Sargeant, III, in at least October 2015, if not before, Arya breached the Quant Services contract.[103]

Defendants' assertion that the Arya Plaintiffs breached the Quant Services Agreement at least as early as October 2015 neither establishes that the Arya Plaintiffs breached the agreement as a matter of law, or that any breach was sufficiently material to

---

[103]Defendants' MSJ, Docket Entry No. 384, p. 28.

excuse Defendants' future performance.   Accordingly, Defendants have failed to meet their burden of showing beyond peradventure that the Arya Plaintiffs engaged in any material breach of the Quant Services Agreement, and therefore are not entitled to summary judgment on this basis.

### (2)   **Waiver and Laches**

Asserting that "Texas courts recognize waiver and laches as an affirmative defense to a breach of contract claim,"[104] Defendants argue that they are entitled to summary judgment on the Arya Plaintiffs' claims for breach of the Quant Services Agreement because

> the Arya Plaintiffs, once aware of the Follow Book, did not insist on back payment or to be made whole, but instead negotiated with Dufossat for *a future piece* of the Follow Book.  Dufossat was willing to provide that future piece to the Arya Plaintiffs, provided the parties entered into a written agreement and resolved Dufossat's copyright and trade secret ownership.  The Arya Plaintiffs refused.  Because the Arya Plaintiffs acted inconsistently with their . . . Quant Services agreement, the Arya Plaintiffs are barred from recovery.[105]

The Arya Plaintiffs respond that Defendants are not entitled to summary judgment under the defenses of waive or laches because while Defendants raised waiver in their Answer, they failed to provide any factual basis to support it and, therefore, failed to

---

[104]<u>Id.</u>

[105]<u>Id.</u> at 28-29.

give Plaintiffs fair notice of the basis for this defense.[106]

Texas courts recognize waiver and laches as affirmative defenses that Defendants must plead and prove. Fed. R. Civ. P. 8(c).  See Moore v. Moore, 568 S.W.3d 725, 731-32 (Tex. 2019)(citing Tenneco Inc. v. Enterprise Products Co., 925 S.W.2d 640, 643 (Tex. 1996)(waiver), and City of Fort Worth v. Johnson, 388 S.W.2d 400, 403 (Tex. 1964)(laches)).  As with all affirmative defenses, the burden of proof on waiver and laches rests with the defendant.  Id.

Under Texas law "the affirmative defense of waiver can be asserted against a party who intentionally relinquishes a known right or engages in intentional conduct inconsistent with claiming that right."  Tenneco, 925 S.W.2d at 643.  See also LaLonde v. Gosnell, 593 S.W.3d 212, 218-19 (Tex. 2019) (same), and Monumental Life Insurance Co. v. Hayes-Jenkins, 403 F.3d 304, 313 (5th Cir. 2005) (same).  The elements of waiver include "(1) an existing right, benefit, or advantage held by a party; (2) the party's actual knowledge of its existence; and (3) the party's actual intent to relinquish that right, or intentional conduct inconsistent with that right."  Ulico Casualty Co. v. Allied Pilots Association, 262 S.W.3d 773, 778 (Tex. 2008).  See also First Interstate Bank of Arizona, N.A. v. Interfund Corp., 924 F.2d 588,

---

[106]Arya Plaintiffs' Response to Defendants' MSJ, Docket Entry No. 385, pp. 30-31.

595 (5th Cir. 1991) (same).  "Waiver is ordinarily a question of fact[, . . . but w]here the facts and circumstances are admitted or clearly established, . . . the question becomes one of law." Tenneco, 925 S.W.2d at 643.  "A party's conduct sufficiently demonstrates intent to waive a right if, in light of the surrounding facts and circumstances, it is unequivocally inconsistent with claiming that right." LaLonde, 593 S.W.3d at 219.

"Laches is an equitable doctrine analogous to statutes of limitation at law." Clark v. Amoco Production Co., 794 F.2d 967, 971 (5th Cir. 1986).  "Laches prevents parties from seeking equitable relief if they have improperly simply rested on their claims and the defendants would be prejudiced as a result of this delay.  Laches ordinarily applies when there is no analogous statutory limitation to draw upon." Id.  See In re Laibe Corp., 307 S.W.3d 314, 318 (Tex. 2010) (per curiam) ("To invoke the equitable doctrine of laches, the moving party ordinarily must show an unreasonable delay by the opposing party in asserting its rights, and also the moving party's good faith and detrimental change in position because of the delay.").

Defendants assert that the Arya Plaintiffs' claim for breach of the Quant Services Agreement is barred by waiver and laches, but Defendants fail to cite evidence establishing that the Arya Plaintiffs voluntarily and intentionally relinquished a known right or engaged in intentional conduct unequivocally inconsistent with

claiming that right.   Nor have Defendants cited any evidence showing that the Arya Plaintiffs unreasonably delayed in bringing suit or that Defendants have thereby been unduly prejudiced. Accordingly, Defendants have failed to meet their burden of establishing that they are entitled to summary judgment based on the affirmative defenses of waiver or laches.

## C.   Claims Asserted by Manoj

Manoj's live complaint asserts claims for Dufossat's breach of the Operating Agreement and breach of a Guaranteed Payment Agreement, Soniat's breach of fiduciary duties and breach of an alleged oral contract to pay Manoj 15% of the Follow Book profits, Declaratory Judgment pursuant to the Texas Declaratory Judgment Act, Texas Civil Practices and Remedies Code § 37.001, and attorneys' fees.[107]   Defendants argue that they are entitled to summary judgment that (1) Manoj has no standing to assert a breach of fiduciary duty claim against Soniat; (2) Manoj cannot prevail on his breach of contract claim for 15% of the Follow Book profits; and (3) Manoj's prior breach of the Operating Agreement precludes the claims that he has asserted against Dufossat for breach of the Operating Agreement and breach of a Guaranteed Payment Agreement.[108]

---

[107]Plaintiff's First Amended Petition, Docket Entry No. 1-10 filed in Civil Action No. 17-3553, pp. 68-69.

[108]Defendants' MSJ, Docket Entry No. 384, pp. 9, and 29-32.

1.   Defendants Are Entitled to Summary Judgment on Manoj's Breach of Fiduciary Duty Claim Against Soniat

Manoj alleges that

> Soniat owed [Manoj] fiduciary duties as the majority owner and managing member of Dufossat, including, but not limited to, the duty of loyalty, the duty to disclose material information, the duty not to engage in self-dealing, and the duty not to harm the company for personal gain.
>
> Soniat breached his fiduciary duties by, among other things, making and hiding large distributions to himself to avoid accounting to [Manoj] for his 3.5% share of such distributions.
>
> Soniat's breach of his fiduciary duties has caused [Manoj] damages, and improperly benefitted Soniat.[109]

Defendants argue that Manoj's breach of fiduciary duty claim asserted against Soniat

> fails as a matter of law because the Operating Agreement eliminated all fiduciary duties, and other duties of loyalty and care owed between Class A members to one another or to Dufossat.  By the Operating Agreement, Dufossat is a Delaware LLC governed by Delaware Law. Delaware law allows Limited Liability Companies, such as Dufossat Capital Puerto Rico, LLC, to eliminate fiduciary duties.  Texas law has a similar provision.  Thus, Manoj's breach of fiduciary duty claims against Soniat fail as a matter of law.[110]

Manoj responds that

> Soniat's breach of fiduciary duties, including making and hiding large distributions to himself to avoid accounting to Manoj for his 3.5% shareholder distributions, rises to the level of bad faith violations that are specifically unrestricted by Delaware statute.  Defendants' statement

––––––––––––––––

[109]Plaintiff's First Amended Petition, pp. 11-12 ¶¶ 54-56, Docket Entry No. 1-10 in Civil Action No. 17-3553, pp. 68-69.

[110]Defendants' MSJ, Docket Entry No. 384, p. 30.

regarding Texas statutes merely serves as an attempt to muddle the waters, given Defendants admit that Delaware law should govern the Operating Agreement.  Therefore, Defendant's [MSJ] on the existence of fiduciary duties should be denied.[111]

Defendants reply that Manoj's argument fails because he does not offer any competent summary judgment evidence to support his conclusory allegations that Soniat has committed acts or omissions that constitute bad faith violations of the implied contractual covenant of good faith and fair dealing.[112]

Manoj alleges that Soniat breached his fiduciary duty as controlling shareholder by among other things, making and hiding large distributions to himself to avoid accounting to Manoj for his 3.5% share of such distributions.  But Manoj has failed to cite any evidence from which a reasonable fact finder could find that Soniat made and/or hid large distributions to himself to avoid accounting to Manoj for his share of such distributions.  Manoj's failure to cite any evidence capable of proving the facts alleged in his complaint is fatal to the breach of fiduciary duty claim that he has asserted against Soniat.  See Little, 37 F.3d at 1075 (explaining that a party moving for summary judgment need only demonstrate the absence of a genuine issue of material fact, but

---

[111]Plaintiff Manoj Ghayalod's Response to Defendants' Motion for Summary Judgment ("Manoj's Response to Defendants' MSJ"), Docket Entry No. 387, pp. 2-3.

[112]Defendants' Reply to Plaintiff Manoj Ghayalod's Response to Defendants' [MSJ] ("Defendants' Reply to Manoj's Response"), Docket Entry No. 390-2, pp. 3-4.

need not negate the elements of the nonmovant's case; that if the
moving party meets this burden, the nonmovant must go beyond the
pleadings and show by affidavits, depositions, answers to
interrogatories, or other admissible evidence that facts exist over
which there is a genuine issue for trial; and that factual
controversies are to be resolved in favor of the nonmovant, "but
only when there is an actual controversy, that is, when both
parties have submitted evidence of contradictory facts").

2.  Defendants are Not Entitled to Summary Judgment on
    Manoj's Breach of Contract Claim for 15% of the Follow
    Book Profits

Manoj alleges that

Soniat and [Manoj] entered into a valid and enforceable
agreement whereby Soniat agreed to pay Ghayalod 15% of
all profits on the Follow Book from UTC trades copied
from the Arya Quants recommendations. In return, [Manoj]
agreed to continue monitoring the Arya Quant recommended
trades, along with the secret Follow Program, thus
allowing Dufossat to continue making millions of dollars
in profits on the Arya Quant recommended trades without
having to pay the normal 30%.

[Manoj] performed his obligations under the
agreement.

Soniat breached the agreement by failing to pay
[Manoj] 15% of the profits made on the Follow Book from
UTC trades recommended by the Arya Quants.

Soniat's breach caused damages to [Manoj].
All conditions precedent to [Manoj]'s claims have
been performed or have occurred.[113]

---

[113]Plaintiff's First Amended Petition, pp. 11 ¶¶ 49-53,
Docket Entry No. 1-10 in Civil Action No. 17-3553, p. 68.

Asserting that "the agreement between Dufossat and Manoj concerning the 15% of the Follow Book profits contained a condition precedent that was not met,"[114] Defendants argue "that [condition precedent] did not, and still has not happened. Furthermore, there was a failure of consideration . . . [t]herefore, there is no contract for the 15% of the Follow Book profits, and Manoj cannot support his claim as a matter of law."[115] Citing his own recently made declaration, Manoj responds that he and "Soniat came to an agreement at a meeting in January 2015 for Manoj to start receiving 15 percent of the Follow Book profits."[116] Manoj argues that "Defendants' reliance on an email from a year later in January 2016, sent in an attempt to change the agreement by adding a condition precedent to the parties' agreement made a year earlier, is clearly misplaced."[117] Citing <u>Doe v. Dallas Independent School District</u>, 220 F.3d 380, 386 (5th Cir. 2000), <u>cert. denied</u>, 121 S. Ct. 766 (2001), Defendants reply that "Manoj's affidavit is sham testimony and should be struck and disregarded by the Court for purposes of summary judgment."[118]

---

[114]Defendants' MSJ, Docket Entry No. 384, p. 30.

[115]<u>Id.</u>

[116]Manoj's Response to Defendants' MSJ, Docket Entry No. 387, p. 3 (citing Declaration of Manoj Ghayalod ("Manoj Declaration"), pp. 1-2 ¶¶ 2-4, Exhibit B to Manoj's Response to Defendants' MSJ, Docket Entry No. 388-2, pp. 2-3).

[117]<u>Id.</u>

[118]Defendants' Reply to Manoj's Response, Docket Entry
(continued...)

In <u>Doe</u> the court applied the sham affidavit rule articulated in <u>S.W.S. Erectors, Inc. v. Infax, Inc.</u>, 72 F.3d 489, 495 (5th Cir. 1996), to hold that the plaintiff could not raise a fact issue in the face of summary judgment simply by submitting an affidavit that contradicts prior sworn testimony.   See also <u>Cleveland v. Policy Management Systems Corp.</u>, 119 S. Ct. 1597, 1603 (1999) (recognizing that [f]ederal courts "have held with virtual unanimity that a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn testimony (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity").

Defendants argue that

> Manoj's Response . . . omits testimony from his own deposition that confirms (1) Manoj and Soniat only "discussed" Manoj receiving 15% of the Follow Book profits and (2) Soniat's 2016 e-mail discusses Manoj's ***prospective*** 15% share.  Once context is restored, it is clear that Manoj and Soniat "discussed" providing Manoj with a 15% bonus on the Follow book, maybe even as early as January 2015, but ***had never agreed*** to do so.  It was not until January 2016 that Soniat indicated a readiness to consummate the proposed agreement and perform ***if*** Arya signed the agreements with Dufossat.[119]

But missing from Defendants' briefing is a cite to any testimony

---

[118](...continued)
No. 390-2, p. 6 & n. 15.

[119]<u>Id.</u> at 7.

from Manoj's deposition that actually contradicts his affidavit testimony that in January of 2015 Soniat agreed to pay him 15% of the Follow Book profits.  Accordingly, the court is not persuaded either that the sham affidavit rule applies to the facts at issue, or that Defendants are entitled to summary judgment on Manoj's claim for breach of an agreement to pay him 15% of the Follow Book profits for this reason.  Because Defendants acknowledge that the summary judgment evidence shows that Manoj and Soniat discussed providing Manoj with a 15% bonus on the Follow book as early as January 2015, whether they reached an agreement on that issue is a question of fact for trial.

   3.   <u>Defendants Have Failed to Establish that Manoj's Prior Breach Entitles Them to Summary Judgment on His Claims for Breach of the Operating Agreement</u>

Manoj alleges that

[t]he Operating Agreement is a valid and enforceable contract entered between Dufossat and [Manoj].

   Dufossat breached the Operating Agreement by making substantial distributions to Soniat and failing to pay, in whole or in part, [Manoj] his pro rata share of such distributions.

   Dufossat's breach has caused [Manoj] damages.

   All conditions precedent to [Manoj]'s claim have been satisfied or have occurred.[120]

Asserting that "Manoj's improper conduct, discharges and

---

[120]Plaintiff's First Amended Petition, p. 10 ¶¶ 41-44, Docket Entry No. 1-10 in Civil Action No. 17-3553, p. 67.

excuses Dufossat's performance under the Operating Agreement,"[121] Defendants argue that

> Manoj breached the Operating Agreement by (1) competing against Dufossat, (2) not protecting the confidentiality of Dufossat's confidential information when he permitted Arya to obtain a copyright over Trader App and disclosed information about the follow book, and (3) assisting in the marketing of Arya and Pallavi's new endeavors. This conduct breaches sections 3.10 and 3.13, among other sections. Manoj admits [that] he was terminated for cause. Therefore, Manoj is barred from recovery under the Operating Agreement as a matter of law.[122]

Manoj responds that Defendants MSJ based on alleged prior breaches of the Operating Agreement should be denied because Defendants have failed to cite any evidence capable of establishing that he failed to protect the confidentiality of Dufossat regarding the Trader App, or that he assisted in marketing ploys against Dufossat.[123] Manoj also argues that Defendants' reliance on his admission that he was terminated for cause is in error because that admission was based on Magistrate Judge Johnson's finding that he electronically wiped four laptop computers that belonged to Dufossat, but those actions do not constitute a prior breach because they did not occur until after he had been locked out of the company, and his breach of contract claim seeks damages from Dufossat for the performance owed him before the date of his

---

[121]Defendants' MSJ, Docket Entry No. 384, p. 31.

[122]Id.

[123]Manoj's Response to Defendants' MSJ, Docket Entry No. 387, pp. 4-5.

lockout.  Citing <u>Bartush-Scnitzius Foods</u>, 518 S.W.3d at 437, Manoj also argues that whether any prior breach was sufficiently material to excuse Defendants' performance is a question of fact for the jury.[124]

Defendants reply that a breach sufficient to preclude Manoj from recovery under the Operating Agreement occurred at some date prior to July 31, 2015, when he disclosed Dufossat's confidential information about the Follow Book to Pallavi,[125] and that

> [i]n any event, Dufossat sent Manoj a letter terminating him for cause as of February 24, 2016, because of multiple instances of bad conduct against the company, including breaking and entering into Dufossat's offices after he had been purposefully excluded, stealing company property (such as laptops), excluding Dufossat from its e-mail (for which Dufossat had to obtain injunctive relief to restore control), and then deletion of corporate information (for which Dufossat had to file a TRO on February 10, 2016).  This conduct occurred long before Manoj wiped the four laptops.[126]

Undisputed summary judgment evidence establishing that Defendants neither terminated Manoj nor took any action against him after learning that he had disclosed confidential information to Pallavi at least as early as July of 2015 contradicts Defendants' contention that conduct was sufficiently material to excuse their own alleged breaches.  Assuming without deciding that the other bad

---

[124]<u>Id.</u> at 5 & n. 15.

[125]Defendants' Reply to Manoj's Response, Docket Entry No. 390-2, 7-8.

[126]<u>Id.</u> at 8.

conduct Defendants argue constitute Manoj's breaches of the Operating Agreement is sufficiently material to excuse their own alleged breaches, Defendants have failed to establish that any of Manoj's bad conduct occurred prior to their own alleged breaches. Undisputed summary judgment evidence establishes that the other bad conduct that Defendants contend constitute breaches of the Operating Agreement did not occur until early February of 2016 when Soniat, without warning, prevented the Arya programmers from accessing Dufossat's computer software and data.

> 4.   Defendants Have Failed to Establish that Manoj's Prior Breach Entitles Them to Summary Judgment on His Claims for Breach of a Guaranteed Payment Agreement

Manoj alleges that

[o]n or about May 1, 2014, Dufossat and [Manoj] entered into a valid and enforceable agreement whereby Dufossat agreed to pay [Manoj] $250,000 per year for a period of five (5) years, in no less than monthly installments.

Dufossat breached the agreement by failing to pay the monthly installments owed under the agreement.

Dufossat's breach has caused [Manoj] damages.

All conditions precedent to [Manoj] claim have been satisfied or have occurred.[127]

Defendants argue that they are entitled to summary judgment on Manoj's claim for breach of the Guaranteed Payment Agreement because that agreement "conditioned the payment on [Manoj's]

---

[127]Plaintiff's First Amended Petition, pp. 10-11 ¶¶ 45-48, Docket Entry No. 1-10 in Civil Action No. 17-3553, pp. 67-68.

continued full-time employment by Dufossat and compliance with the Operating Agreement."[128]   Defendants argue that

> Manoj's improper conduct discharges and excuses Dufossat from performance under the guaranteed payment [agreement].  As discussed above, Manoj breached the Operating Agreement, including, but not limited to sections 3.10 and 3.13.  That conduct was also a breach of the guaranteed payment [agreement].  Manoj admits that he was terminated for cause.  Therefore, Manoj is barred from recovery under the guaranteed payment [agreement] as a matter of law.[129]

Manoj responds that he is seeking performance of the Guaranteed Payment Agreement "up to the date he was locked out of the company.  His alleged actions taken after he was locked out cannot, therefore, constitute a _prior_ breach of the Operating Agreement."[130]   Manoj also argues that

> there exists a question of fact as to whether [his] actions constitute a nonmaterial or material breach of the Operating Agreement.  A party's nonmaterial breach does not excuse further performance by the other party. . . . The materiality of a breach of contract is a question for the jury.[131]

For the reasons stated in the preceding section, § IV.C.3, in which the court has already concluded that Defendants failed to establish that they are entitled to summary judgment on Manoj's

---

[128]Defendants' MSJ, Docket Entry No. 384, p. 31 (citing Dufossat Capital Puerto Rico, LLC Unanimous Consent, Exhibit H, Docket Entry No. 384-10, p. 2).

[129]_Id._ at 31-32.

[130]Manoj's Response to Defendants' MSJ, Docket Entry No. 387, p. 6.

[131]_Id._

claim for breach of the Dufossat Operating Agreement, the court concludes that Defendants have failed to establish that they are entitled to summary judgment on Manoj's claim for breach of the Guaranteed Payment Agreement, which is Exhibit A to the Dufossat Operating Agreement.

### V. <u>Conclusions and Order</u>

For the reasons stated in § II, above, Defendants' Motion to Strike Response of Manoj Ghayalod is **DENIED**, and Defendant's Alternative Motion for Leave to Exceed the 25-Page Briefing Limit by filing Defendants' Reply to Manoj's Response to Defendants' Motion for Summary Judgment attached as Exhibit A to Defendants' Motion to Strike is **GRANTED**. Accordingly, Defendants' Motion to Strike Response of Manoj Ghayalod and, in the Alternative, Motion for Leave to Exceed the 25-Page Briefing Limit, Docket Entry No. 390, is **GRANTED in PART** and **DENIED in PART**.

For the reasons stated in § III.A, above, Plaintiffs' Arya and Wincab's Motion for Leave to File Sur-Reply Relating to Defendants' Motion for Summary Judgment and Brief in Support, Docket Entry No. 394, is **DENIED**. For the reasons stated in § III.B, above, Plaintiff Manoj Ghayalod's Motion for Leave to File Summary Judgment Sur-Reply, Docket Entry No. 396, is **DENIED**.

For the reasons stated in § IV.B, above, Defendants' Motion for Summary Judgment as to the claims asserted by the Arya

Plaintiffs is **DENIED**, and Defendants' Motion for Summary Judgment as to the claims asserted by Manoj Ghayalod is **GRANTED** as to the claim for breach of fiduciary duty asserted against Ashton Soniat and **DENIED** as to all other claims. Accordingly, Defendants' Motion for Summary Judgment, Docket Entry No. 384, is **GRANTED in PART and DENIED in PART**.

The causes of action and defenses in this case have been greatly narrowed since the court ordered the parties to mediate by November 1, 2019. Moreover, the court has already set a number of cases for trial and would not be able to try this case before late this year at the earliest. Accordingly, the court will refer this case to Senior Judge Nancy F. Atlas for mediation. If Judge Atlas declares an impasse, the court will enter an order for filing an amended joint pretrial order and attachments.

**SIGNED** at Houston, Texas, on this 24th day of May, 2022.

SIM LAKE
SENIOR UNITED STATES DISTRICT JUDGE